# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | |
|---|---|
| ARTHUR BOMAR, | : |
| | : |
| Appellant, | : Case No. 24–9001 |
| | : |
| v. | : DEATH PENALTY CASE |
| | : |
| LAUREL HARRY, Secretary, Pennsylvania Department of Corrections, et al., | : |
| | : |
| Appellees. | : |
| | : |

## APPELLANT'S APPLICATION
## FOR CERTIFICATE OF APPEALABILITY

LISA EVANS LEWIS
Chief Federal Defender
KATHERINE ENSLER
JOSEPH W. LUBY
CARRIE ALLMAN
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Curtis Building, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928–0520
Counsel for Appellant Arthur Bomar

Dated: July 24, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF THE CASE ........................................................... 1

   A.  Procedural History ..................................................................... 1

   B.  The Trial Evidence ..................................................................... 2

   C.  The PCRA Evidence ................................................................... 7

STANDARD FOR GRANTING A  CERTIFICATE OF APPEALABILITY ..... 13

ARGUMENT ................................................................................ 15

I.     REASONABLE JURISTS COULD DEBATE WHETHER MR.
      BOMAR'S RIGHT TO AN IMPARTIAL JURY WAS VIOLATED
      WHERE EXTRANEOUS INFORMATION REGARDING A DEATH
      THREAT TO THE JURY WAS CONVEYED BY SECURITY STAFF
      TO ONE OF THE JURORS. .................................................... 15

   A.  The Constitutional Violation ...................................................... 16

   B.  State Court Adjudication ........................................................... 18

   C.  Bomar Was Entitled to a Presumption of Prejudice Based on the Improper
       Communication, and Reasonable Jurists Could Debate the District Court's
       Ruling to the Contrary. .......................................................... 19

   D.  If Bomar Bears the Burden of Showing Prejudice, He Has Done So. ........ 23

II.   REASONABLE JURISTS COULD DEBATE WHETHER THE
      COMMONWEALTH VIOLATED BOMAR's DUE PROCESS RIGHTS
      BY PRESENTING FALSE AND MISLEADING TESTIMONY AND
      SUPPRESSING EXCULPATORY EVIDENCE. ........................... 29

   A.  Reasonable Jurists Could Debate Whether the Commonwealth Violated
       Bomar's Due Process Rights by Presenting O'Donald's False and
       Misleading Testimony and by Suppressing its Promise to Him. ............... 29

   B.  Reasonable Jurists Could Debate Whether the Commonwealth Violated
       Bomar's Due Process Rights by Suppressing its Agreement with Williams
       and Presenting His False and Misleading Testimony. .............................. 55

III.    REASONABLE JURISTS COULD DEBATE WHETHER TRIAL
        COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP,
        AND PRESENT MITIGATING EVIDENCE, INCLUDING EVIDENCE
        OF BOMAR'S BRAIN DAMAGE AND IMPAIRED JUDGMENT. ........60

    A.  The Underwhelming Trial Mitigation ..........................................................61

    B.  Penalty-Phase Counsel Performed Deficiently. ..........................................62

    C.  Bomar Was Prejudiced by Trial Counsel's Deficient Penalty-Phase
        Investigation. ...........................................................................................70

    D.  This Court Must Apply De Novo Review to Bomar's Claim, Because the
        State Court's Ruling Was Incomplete and Unreasonable as Explained by
        the District Court. ....................................................................................77

    E.  This Court Should Certify Bomar's Claim Because the District Court's
        Rulings are Debatable Among Reasonable Jurists. .....................................79

IV.     REASONABLE JURISTS COULD DEBATE WHETHER THE
        MULTIPLE CONSTITUTIONAL VIOLATIONS AT BOMAR'S TRIAL
        CUMULATIVELY REQUIRE HABEAS RELIEF. ..................................86

CONCLUSION ......................................................................................................88

# TABLE OF AUTHORITIES

## Federal Cases

*Affinato v. Hendricks*, 366 F.3d 252 (3d Cir. 2004) .............................................. 67

*Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007) ..................................................... 86

*Allen v. Stephan*, 42 F.4th 223 (4th Cir. 2022) ..................................................... 60

*Banks v. Dretke*, 540 U.S. 668 (2004) ...................................................... 41, 42, 44

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ............................................................... 14

*Blystone v. Horn*, 664 F.3d 397 (3d Cir. 2011) ........................................... 67, 69, 70

*Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008) ............................................. 46, 64, 77

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................. 29, 30, 31, 32

*Bridges v. Beard*, 941 F. Supp. 2d 584 (E.D. Pa. 2013) ........................................ 64

*Buck v. Davis*, 580 U.S. 100 (2017).................................................................13, 14

*Collins v. Sec'y of Pa. Dep't Corr.*, 742 F.3d 528 (3d Cir. 2014) ........................ 46

*Cone v. Bell*, 556 U.S. 449 (2009) ......................................................................... 42

*Cunnigham v. Shoop*, 23 F.4th 636 (6th Cir. 2022) .............................................. 22

*Dickerson v. Vaughn*, 90 F.3d 87 (3d Cir. 1996) ................................................... 47

*Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008) .......................................................... 86

*Giglio v. United States*, 405 U.S. 150 (1972) ..................................... 35, 36, 39, 43

*Glossip v. Oklahoma*, 145 S. Ct. 612 (2025) ............................................. 41, 43, 48

*Haskell v. Superintendent Greene SCI*, 866 F.3d 139 (3d Cir. 2017) ........... *passim*

*Irvin v. Dowd*, 366 U.S. 717 (1961) ...................................................................... 17

*Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002) ......................................... 14

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................... *passim*

*Marshall v. Hendricks*, 307 F.3d 36 (3d Cir. 2002) ............................................. 63

*Mattox v. United States*, 146 U.S. 140 (1892) ................................................ *passim*

*Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919 (10th Cir. 1992) ...... 22

*Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) ........................................... 86

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................... 14, 23, 86

*Napue v. Illinois*, 360 U.S. 264 (1959) ....................................... 29, 39, 43, 47

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ........................................................ 77

*Parker v. Gladden*, 385 U.S. 363 (1965) ........................................................ 25, 27

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................................ 74, 75

*Porter v. McCollum*, 558 U.S. 30 (2009) ........................................................ 74

*Remmer v. United States*, 347 U.S. 227 (1954) ........................................ 15, 17, 20

*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................ *passim*

*Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579 (3d Cir. 2015) ............ 46, 64

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ........................................................ 24

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................................ 16

*Slack v. McDaniel*, 529 U.S. 473 (2000) ................................................ *passim*

*Smith v. Phillips*, 455 U.S. 209 (1982) ........................................................ 21

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................... 62, 63, 83

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ........................................................ 86, 87

*Thomas v. Horn*, 570 F.3d 105 (3d Cir. 2009) ................................................ 76, 85

*Thornell v. Jones*, 602 U.S. 154 (2024) ........................................................ 75

*Turner v. Louisiana*, 379 U.S. 466 (1965) ........................................................ 25

*United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993) ........................................ 24

*United States v. Bagley*, 473 U.S 667 (1985) ................................................ *passim*

*United States v. Bassler*, 651 F.2d 600 (8th Cir. 1981) .................................... 22

*United States v. Console*, 13 F.3d 641 (3d Cir. 1993) ........................................ 22

*United States v. Fields*, 949 F.3d 1240 (10th Cir. 2019) ................................ 75, 76

*United States v. Hillard*, 701 F.2d 1052 (2d Cir. 1983) .................................... 22

*United States v. Lloyd*, 269 F.3d 228 (3d Cir. 2001) ........................................ 22

*United States v. Moss*, 410 F.2d 386 (3d Cir. 1969) ........................................ 24

*United States v. Perkins*, 748 F.2d 1519 (11th Cir. 1984) .................................. 22

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) .................................... 40

*Wearry v. Cain*, 577 U.S. 385 (2016)............................................................36

*Whitehead v. Johnson*, 157 F.3d 384 (5th Cir. 1998) ........................................ 14

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................ *passim*

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................ 63, 83

*Wilson v. Sellers*, 584 U.S. 122 (2018) ................................................................. 77

## Federal Statutes

28 U.S.C. § 2253 ................................................................................. 13, 14, 81

28 U.S.C. § 2254 ......................................................................................... *passim*

## State Cases

*Carter by Carter v. U.S. Steel Corp.*, 604 A.2d 1010 (Pa. 1992) ......................... 18

*Commonwealth v. Bomar*, 104 A.3d 1179 (Pa. 2014) ................................... *passim*

*Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003) ........................................ 1, 39

*Commonwealth v. Bomar*, No. 5045-97, 2012 WL 9515416 (Del. Cnty. Ct. Comm. Pls. Sept. 4, 2012) .................................................................................. 45, 48, 59

*Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002) ................................................. 78

*Commonwealth v. Sneed*, 45 A.3d 1096 (Pa. 2012) ............................................ 18

## State Statutes

42 Pa. C.S. § 9711 ......................................................................................... 6, 7, 76

## Other

Fed. R. App. P. 22 ................................................................................................ 13

Fed. R. App. P. 27 .................................................................................................. 1

Fed. R. App. P. 32 .................................................................................................. 1

## STATEMENT OF THE CASE

### A.    Procedural History

Bomar was charged in Delaware County with the homicide of Aimee Willard and related charges. Following a jury trial in the Court of Common Pleas, he was convicted on October 1, 1998, of first-degree murder, rape, aggravated assault, kidnapping, and abuse of corpse. A1, 8. Following a penalty-phase hearing, on October 5, 1998, the jury returned a death verdict on the murder count. NT 10/5/98 at 199; A10. On December 4, 1998, Bomar was formally sentenced to death and to terms of years on the non-capital offenses. A11. The Pennsylvania Supreme Court affirmed Bomar's convictions and sentences on direct appeal, and rejected certain ineffective-assistance claims that were developed post-judgment. *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003) ("*Bomar I*"), *cert. denied*, 540 U.S. 1115 (2004). After conducting an evidentiary hearing, the Court of Common Pleas denied Bomar's petition under the Post Conviction Relief Act ("PCRA"), and the Pennsylvania Supreme Court again affirmed. *Commonwealth v. Bomar*, 104 A.3d 1179 (Pa. 2014), *cert. denied*, 577 U.S. 833 ("*Bomar II*").

The United States District Court for the Eastern District of Pennsylvania denied Bomar's petition for writ of habeas corpus on March 31, 2023. A224. The same order denied a certificate of appealability ("COA"). *Id.* Bomar moved to alter or amend the judgment, but the district court denied the motion on April 5, 2024.

1

A225–41. On the same date, the district court issued a "corrected" memorandum explaining its reasons for denying habeas corpus relief, and reflecting various non-substantive edits to the court's original memorandum. A1–223. Bomar filed a timely notice of appeal, Dist. Dkt. 74, and this application follows.

### B.    The Trial Evidence

On June 20, 1996, police discovered Aimee Willard's body in a vacant lot near 16th Street and Indiana Avenue in Philadelphia. NT 9/22/98 at 63–66. Ms. Willard's body was naked and face-down on the ground, with two plastic bags over her head and a tree branch between her legs. *Id.* at 64–65, 93–94. However, as noted by the medical examiner, there was "absolutely no evidence that it was inserted into her vagina." NT 9/23/98 at 95. She had numerous blunt-force injuries to the head, which crushed her skull and caused fatal brain injuries. *Id.* at 94, 167–71; NT 9/23/98 at 26–28, 37–38, 42–43, 50. Among other wounds, police also noticed a burn injury on the upper abdomen and lower chest. NT 9/22/98 at 167; NT 9/23/98 at 77–78. Police did not detect any blood near Ms. Willard's body, leading them to believe that she had been killed somewhere else. NT 9/22/98 at 108, 168, 194.

Earlier that day, Ms. Willard's car had been located on an off-ramp of Interstate 476 in Delaware County, Pennsylvania – some 23 miles from where her body was found. NT 9/21/98 at 172–76, 222–24; NT 9/22/98 at 27. A pool of blood and a tire iron were found near the vehicle, as were Ms. Willard's shoes and a pair

of underwear matching her size. NT 9/21/98 at 224–25, 241–42, 259–60, 322; NT 9/22/98 at 39–41.

Prosecutors relied on several out-of-court statements to link Bomar to the killing. First, Mary Rumer (Bomar's ex-fiancée) testified that Bomar admitted to the crime. Rumer testified that Bomar said he stopped Ms. Willard on I-476, punched her after she became angry, killed her by hitting her head with a hard object, had sex with her at some unspecified point, and left her body in an abandoned building. NT 9/25/98 at 145–52.

Another series of alleged admissions came in through David O'Donald, Bomar's former brother-in-law. O'Donald was in federal custody awaiting sentencing for bank robbery, but federal and state law enforcement arranged for his transfer to Montgomery County so that he could elicit statements from Bomar. NT 9/28/98 at 244–48, 283–85. O'Donald denied that prosecutors had "promised" him anything for his cooperation or that he had an "agreement" with them. *Id.* at 256, 272. He admitted that he had a plea agreement with the Government in his federal case that was made prior to his cooperation in the Bomar case; O'Donald also testified that he faced up to 34 years imprisonment on his bank robbery conviction and was sentenced to 17 years after the federal judge was advised of his cooperation pursuant to the plea agreement, which included his cooperation in Bomar's case at the time. *Id.* at 258–59.

3

O'Donald testified that Bomar expressed regret that he failed to hide Ms. Willard's body, i.e., "No body, no grand jury indictment." *Id.* at 250–51. O'Donald also stated that Bomar said, "I almost took her head off, and we crammed a tree branch up her cunt." *Id.* at 252. The latter statement conflicted with the bulk of testimony from other prosecution witnesses. *See, e.g.*, NT 9/22/98 at 200 (per Det. Jeff Piree, tree branch was between the legs and not inserted into the vagina); NT 9/23/98 at 94–95 (no physical trauma to vaginal area and "absolutely no evidence" that a tree branch was inserted, per medical examiner Dr. Edwin Lieberman); NT 9/29/98 at 151 (per Corp. Tedescung Bandy, "The tree branch appears to be resting against her pubic area. It ascends from below her pubic region and up between her legs next to her vagina."). Police nevertheless considered O'Donald's description of a tree branch to be significant, because that particular detail had not been reported to the public. NT 9/29/98 at 34.

Still more alleged admissions were described by Quincy Williams, who was incarcerated with Bomar in Montgomery County while awaiting trial on first degree murder and related charges. NT 9/25/98 at 47–48. Like O'Donald, Williams insisted that he had not been "promised" anything for his testimony and that he and the prosecution had "no agreement" and "no deal whatsoever" – even though one of Bomar's prosecutors had testified at Williams' sentencing on a reduced charge of voluntary manslaughter. *Id.* at 48, 55, 58–60, 63, 66–68. According to Williams,

Bomar stated that he met Ms. Willard at a bar, had sex with her, strangled her to death, and left her body beside a highway. *Id.* at 50–53.

The Commonwealth also offered several types of forensic evidence. Tire tracks near the victim's car on I-476 were consistent with a tire tread from Bomar's car. NT 9/24/98 at 234–43. A pattern of shapes and lines from the oil pan on Bomar's car were consistent with the thermal injury on the right side of Ms. Willard's body. NT 9/25/98 at 85–87. A vaginal swab from Ms. Willard's body revealed sperm cells, from which DNA results corresponded with Bomar's DNA profile. NT 9/28/98 at 88–90. Blood stains from the door panel of Bomar's car were consistent with Ms. Willard's DNA profile and inconsistent with Bomar's. *Id.* at 211–14; NT 9/29/98 at 17–18, 23. The prosecutor urged the jury to convict Bomar of first-degree murder in light of the evidence described above. NT 9/30/98 at 133–37.

During the penalty phase, the Commonwealth relied on three statutory aggravating circumstances. First, it alleged that Bomar committed the murder in the course of a kidnapping and rape as described during the guilt phase. NT 10/2/98 at 39, 70. Second, it urged that Bomar had a significant history of violent felony convictions, including Nevada convictions for battery and second-degree murder. *Id.* at 48–51, 61, 66–68. Third and relatedly, it contended that Bomar had previously been convicted of another murder. The jury found all three aggravators. NT 10/5/98 at 199.

5

The penalty-phase defense asserted two mitigating circumstances: that Bomar acted under an extreme mental or emotional disturbance, as well as the "catch-all" mitigating circumstance concerning Bomar's background and character. *See* 42 Pa. C.S. § 9711(e)(2), (8). Counsel called forensic psychologist Dr. Gerald Cooke in support of the (e)(2) mitigator. Dr. Cooke diagnosed Bomar with borderline personality disorder and antisocial personality disorder, which he characterized as extreme mental and/or emotional disturbances. NT 10/5/98 at 51–52, 55–56, 78. Dr. Cooke also described the "possibility" that Bomar suffered from organic brain damage, and that such a cognitive disorder would qualify as an extreme mental disturbance if it were diagnosed. *Id.* at 38, 49–50, 56. Nevertheless, Dr. Cooke could not reach a "firm conclusion" on the issue. *Id.* at 49. He explained that Bomar was distracted during the testing, could not "sustain his attention" very well, and showed variable motivation. *Id.* The prosecution argued that the defense had not sustained its burden of proof on the proposed mitigator and that "just putting up a psychologist like Dr. Cooke doesn't carry the day." *Id.* at 145–46. None of the jurors credited the defense's primary mitigating circumstance. *Id.* at 200.

Eight lay witnesses testified briefly for the defense. Bomar's mother and half-brother insisted that Bomar was innocent. *Id.* at 92–95. A half-sister testified that Bomar's parents fought violently with each other, that Bomar's father sexually abused her, and that Bomar's mother was neglectful and never held him as a baby.

*Id.* at 108–17. Other witnesses gave similarly brief testimony: two described Bomar's involvement in his church, one described his polite and respectful personality, and one testified that Bomar returned a wallet she had lost at a hospital. *Id.* at 83, 86–88, 96–99, 119–23. On the proposed "catch-all" mitigator, one or more jurors credited Bomar's "apparent remorse, character, dysfunctional childhood/family life and mental ability." *Id.* at 200. The jurors unanimously found that the aggravating circumstances outweighed the mitigating circumstances, and they sentenced Bomar to death. *Id.* at 199.

### C.    The PCRA Evidence

Undersigned counsel summarize only the post-conviction evidence relevant to the claims at issue here, with additional evidence to be described in the argument section for each claim.

### 1.    Evidence relating to Bomar's jury-tainting claim

During PCRA proceedings, juror William Mertz described the heightened security measures at the time of trial. Having been selected in and transported from Westmoreland County (just east of Pittsburgh), jurors were sequestered at a hotel and were protected at all times by two deputies and two court officers – all of whom carried firearms and wore bullet-proof vests. A242. Mertz asked one of the law enforcement officers about the security, and the officer mentioned "threats towards the jury." NT 10/20/09 at 8. The deputy stated that a "gang in Philadelphia" had

7

made a "death threat" against the jury. A242. The conversation occurred during the trial, and Mertz understood that the officers "made sure we weren't sitting ducks." A243.

### 2.    Evidence relating to Bomar's *Brady* and *Napue* claim

The postconviction evidence contradicted David O'Donald's trial testimony in numerous respects. Notwithstanding O'Donald's testimony that he had agreed to cooperate against Bomar out of concern for his sister, and that he was offered nothing for his cooperation, NT 9/28/98 at 256, federal prosecutors moved to reduce his sentence some two weeks after he testified at Bomar's trial. PCRA Ex. 17 (Rule 35 motion) at 1–3. The court reduced O'Donald's bank-robbery sentence from 17 years to 14 years, based solely on O'Donald's cooperation against Bomar. PCRA Ex. 18 (sentence reduction transcript) at 29. O'Donald later moved the court for a larger reduction, urging that prosecutors had led him to believe that "if he cooperate[d] he would receive a substantial reduction of his 17 year sentence." PCRA Ex. 20 (O'Donald pro se motion) ¶ 2.

O'Donald testified to like effect at Bomar's PCRA hearing. He said that prosecutors told him that the Government would move to reduce his sentence if he testified against Bomar. NT 1/15/09 at 27. The original state-court prosecutor (Joseph McGettigan) met with O'Donald, his attorney, and employees of the U.S. Attorney's Office on July 2, 1997. PCRA Ex. 92 at 1–2. McGettigan prepared a

document entitled "Points to Cover Re: Prison Informant," which was never disclosed to the defense. *Id.* at 2; NT 1/15/09 at 127, 131–32; A244–46. The "Points to Cover" memo explained, among other things, that McGettigan could inform federal prosecutors "as to my opinion of the sincerity and candor of your cooperation," and that any benefit from cooperation would flow solely from O'Donald's "sincere and candid cooperation in terms of your willingness to serve as a 'listening post' for Bowmar [*sic*]." PCRA Ex. 79; A244–46.

The District Attorney's Office then acted in accordance with the "Points to Cover" memo. ADA Daniel McDevitt consulted with the federal prosecutor and "expressed his thankfulness" for O'Donald's cooperation. NT 1/16/09 at 39; NT 1/15/09 at 24, 143–44, 146, 151. McDevitt also reviewed a draft of the federal prosecutor's sentence-reduction motion to ensure that it accurately described that cooperation. NT 1/16/09 at 35–37.

Trial witness Quincy Williams offered similar testimony at Bomar's PCRA hearing. In contrast to his trial testimony – and that of his Montgomery County prosecutor – that Williams received no consideration for testifying against Bomar, NT 9/25/98 at 55, 57, 66, 111–14, Williams said that he was indeed promised a "deal" to testify, NT 9/24/09 at 12. Delaware County prosecutors pledged that, if he testified against Bomar and said "certain things," Williams would be paroled at the end of his minimum sentence, or in 2002. *Id.* at 5–6, 8, 12. McDevitt told Williams

that he would "help me out" and that Williams would be released after serving his minimum sentence. *Id.* at 7, 10–11. Williams specifically recanted his trial testimony denying a "deal," explaining that he had denied the "deal" in order to make his parole. *Id.* at 23. He further clarified that part of the agreement he had with the prosecution was to pretend that there was no deal and that he was merely testifying to "do the right thing," that Bomar had never made any disclosures to him, and that he was fed information by the prosecution and used "like a puppet." *Id.*

### 3.    Evidence relating to Bomar's ineffective-assistance claim

Penalty phase counsel Shawn McLaughlin wished to show that her client had organic brain damage, so as to offer "something concrete that could tell the jury why he did what he did." NT 11/6/08 at 73. But she blamed Bomar for not adequately cooperating with Dr. Cooke's neuropsychological testing. NT 3/4/99 at 246–48, 260–61; NT 11/6/08 at 101. Counsel also blamed Bomar for the defense's failure to get "the full picture" of his personal and family history – a shortcoming that she attributed to Bomar's refusal to assist her more fully. A167, 172; *Bomar II*, 104 A.3d at 1202–03.

Trial counsel developed a list of eight family witnesses from names suggested by Bomar and his half-sister. PCRA Ex. 48; NT 11/6/08 at 70–71, 87–89, NT 3/4/99 at 245. From this list, counsel spoke only with the half-sister. NT 11/6/08 at 31–33; NT 11/7/08 at 157; PCRA Ex. 12B at 3; PCRA Ex. 12D at 6; PCRA Ex. 12H at 8.

Counsel hired an investigative firm to contact the witnesses, but most of Bomar's relatives did not know about his trial until several years later, when they were contacted for PCRA proceedings. NT 3/4/99 at 237–38, 249–54; NT 11/6/08 at 34–35, 107–09, 118; NT 11/7/08 at 144.

Unknown to trial counsel, Bomar was severely affected by his parents' mental illness and violent relationship – especially his mother's volatile behavior, hallucinations, and paranoid ideations. PCRA Ex. 12H at 4–8; NT 11/7/08 at 126, 129–34, 158–59. As a young child, Bomar had a "split personality" and would "stare off into space." PCRA Ex. 12H at 4, 6. Bomar's aunt, Anna Wilson, stated that Bomar's mother drank while she was pregnant with Bomar and physically fought Bomar's father as well as a woman at a bar. *Id.* at 2.

Similarly incomplete were the medical and correctional records that counsel obtained and provided to her mental-health expert. Counsel knew that Bomar had been treated at the Aldie Counseling Center as part of his Nevada probation, but she failed to provide an adequate release. NT 11/6/08 at 49–50, 99, 111–13. The Aldie records would have shown that Bomar's extreme paranoia prevented him from completing testing, that Bomar was diagnosed with paranoid personality disorder, and that Bomar was suspected of having an impulse control disorder. PCRA Ex. 36. Counsel also failed to obtain Nevada correctional records of evaluations by Dr. Robert Whittemore and Dr. John Chappel, which disclosed Bomar's cognitive

11

impairments, his difficulties with memory and sequencing, and his guardedness about the family's history. PCRA Ex. 33 (Nevada DOC records); PCRA Ex. 27 (Chappel report); NT 11/6/08 at 193–96, 268–70. Other records that trial counsel *did* obtain were not provided to any experts. Those records include documents from the Delaware County and Montgomery County prisons that described Bomar's pretrial suicide attempts, delusions, and paranoid behavior, as well as the sedatives and anti-psychotic drugs that the prisons administered. NT 11/5/08 at 98–100; NT 11/6/08 at 185–87; PCRA Ex. 1; PCRA Ex. 34.

The cumulative weight of the trial and post-conviction evidence would have allowed Dr. Cooke to diagnose Bomar with organic brain damage, which he was unable to do at the time of trial. NT 11/6/08 at 200–04, 236, 248–50, 296–97, 308–09. Of particular importance to Dr. Cooke was Dr. Whittemore's 1979 report from Nevada correctional records. Dr. Whittemore found mild impairments on the Bender Gestalt test, and he observed that Bomar "has a lot of trouble sequencing" and "cannot easily distinguish between similar stimuli." *Id.* at 168–71. Dr. Cooke described those findings as "important manifestation[s] of organic brain dysfunction." *Id.* at 170. The events described by Bomar's aunt confirmed for Dr. Cooke that Bomar "did sustain organic brain damage of some sort either due to alcohol or trauma probably in utero." *Id.* at 201–02, 296–97, 308–09. Psychiatrist Dr. Richard Dudley and neuropsychologist Dr. Daniel Martell concurred with Dr.

Cooke's diagnosis of brain damage. NT 10/21/09 at 140; NT 7/28/10 at 45–51. Testifying for the Commonwealth, psychiatrist Dr. Timothy Michals opined that the documentary evidence was insufficient to diagnose organic brain damage. NT 2/3/10 at 113, 171–76, 182–84.

Bomar's diagnosis of organic brain damage reflects "substantial impairment" in "executive frontal lobe functions," including difficulties in judgment, reasoning, problem-solving, and behavior regulation. NT 7/28/10 at 125; NT 11/6/08 at 217, 284. He fails to anticipate the consequences of his actions and especially the impact on other people. NT 11/6/08 at 150. And he easily "lose[s] control" over "aggressive and sexual impulses." *Id.* at 150; NT 10/21/09 at 53–54; NT 7/28/10 at 126. No such deficits were known to the sentencing jury.

## STANDARD FOR GRANTING A
## CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253 and Fed. R. App. P. 22(b), a habeas petitioner who wishes to appeal a district court's final order must obtain a COA for each claim on which appeal is sought. In *Buck v. Davis*, the Supreme Court explained that the COA determination is a "threshold" inquiry that "is not coextensive with a merits analysis." 580 U.S. 100, 115 (2017). Instead, the Court must grant a COA if the district court's ruling is "debatable amongst jurists of reason," if reasonable jurists could debate whether the petition should have been resolved "in a different manner," or if reasonable jurists could conclude that the issues presented are "adequate to

deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

This is a low bar, particularly in a capital case. *See Barefoot v. Estelle*, 463 U.S. 880, 893 (1983), *superseded on other grounds by* 28 U.S.C. § 2253 (1994) (holding that "[i]n a capital case, the nature of the penalty is a proper consideration" weighing in favor of granting a COA). Petitioner need not "show[] that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Rather, all he must do is prompt a reasonable debate based on a brief "overview of [his] claims." *Id.* at 336. A court should not decline an application "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Buck*, 580 U.S. at 117 (quoting *Miller-El*, 537 U.S. at 338).

In this Circuit, a COA must issue on any claim if any judge on the three- judge panel determines that Appellant has met this low threshold. *See* 3d Cir. L.A.R. 22.3. When considering whether to grant a COA, a court should resolve any doubts in favor of the applicant. *See Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002); *Whitehead v. Johnson*, 157 F.3d 384, 386 (5th Cir. 1998).

# ARGUMENT

## I. REASONABLE JURISTS COULD DEBATE WHETHER MR. BOMAR'S RIGHT TO AN IMPARTIAL JURY WAS VIOLATED WHERE EXTRANEOUS INFORMATION REGARDING A DEATH THREAT TO THE JURY WAS CONVEYED BY SECURITY STAFF TO ONE OF THE JURORS.

During Bomar's trial a juror inquired about the high level of security and was told by a deputy that a death threat had been made against the jury by a gang from Philadelphia. NT 10/20/09 at 8–11; Mertz Decl. A242–43. This statement was unquestionably improper, as noted by the district court. A237–38. Despite this recognition, relief was denied. The district court, like the state court, found that such commentary did not prejudice Bomar. This determination is incorrect for two reasons. First, neither the state court nor the district court applied the presumption of prejudice required by *Remmer v. United States*, 347 U.S. 227 (1954), and its progeny and instead required Bomar to prove prejudice. Second the determination that there was no prejudice because the threat was vague and not connected to Bomar is belied by the record. *See* A238. A death threat against the jury is not vague, and Bomar's connections to the Philadelphia area were frequently mentioned throughout trial, including during the Commonwealth's opening statement claiming "you will see a veritable laundry list of contacts Arthur Bomar has with North Philadelphia before and after the killing of Aimee Willard." NT 9/21/98 at 75.

15

There is no ambiguity about what a threat of death means, particularly in a case involving allegations of extreme violence towards a young woman, and where the jury is ultimately tasked with determining whether or not a death sentence is appropriate. Consideration of defendant's future dangerousness is "inevitable" in capital sentencing. *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). The statement of the deputy suggested that Bomar was an extremely dangerous and threatening person, especially to the jurors themselves. Additionally, the continued linking of Bomar to the Philadelphia area, in a trial occurring in Delaware County before a jury brought in from across the state, would lead any reasonable juror to connect the threat of a Philadelphia gang to Bomar.

This Court should grant a COA because the presumption of prejudice as required by *Remmer* is clearly established federal law followed by this Circuit and because reasonable jurists could debate whether Bomar was prejudiced even without the benefit of *Remmer*'s presumption.

### A.    The Constitutional Violation

Bomar's rights under the Sixth and Fourteenth Amendments were violated where a juror was exposed to prejudicial information from a deputy during the trial. A defendant has the right to be tried by an impartial jury that is free from any extraneous influences that could interfere with the fact-finding process. This is not a novel concept. "The right to jury trial guarantees to the criminally accused a fair

trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal citation omitted). When jurors are exposed to extrajudicial communications, especially where such information bears on the matter pending before them, such communication is presumptively prejudicial. *Remmer*, 347 U.S. at 228–29. Here, the jury was exposed to extraneous information tending to disturb its exercise of deliberate and unbiased judgment.

Prior to trial, Bomar requested and was granted a change of venire. As a result the jurors were selected in Westmoreland County and then transported to Delaware County, where they were sequestered in a hotel near the courthouse for over two weeks. *See Bomar II*, 104 A.3d at 1186 n.1. During the trial, the jurors were guarded and escorted to the courthouse by law enforcement personnel. NT 10/20/09 at 8; A242–43. They were "protected well by two deputies and by two court officers at all times." A242.

During the PCRA proceedings, juror Mertz testified that when the jurors were being escorted by law enforcement, he had a conversation with one of the deputies about the amount of security surrounding the jury. NT 10/20/09 at 8. Mertz recalled "that during one conversation, there was a mention of threats towards the jury." *Id.* When asked about his recollection of the nature of the threats, Mertz testified that "I would have to imagine harm towards the jury, but I am not sure." *Id.* at 9. To refresh

17

his recollection, Mertz was shown a declaration that he previously signed regarding the threats. *Id*.

Within that declaration, Mertz stated that the security staff wore bullet-proof vests and carried weapons. He detailed the level of protection afforded to the jury explaining, "they made sure that we weren't sitting ducks. One day we got into traffic and within 30 seconds cops pulled up and we pulled across the median and got moving." A243. Mertz asked one of the deputies about all of the security, noting that while he was aware this was a high publicity case, he did not think that would be a reason for all the security. A242. The deputy responded that there had been a death threat against the jury by a gang in Philadelphia. *Id*. This conversation occurred during the trial. *Id*.

### B.    State Court Adjudication

The Pennsylvania Supreme Court denied relief, relying on state court precedent including *Commonwealth v. Sneed*, 45 A.3d 1096 (Pa. 2012), and *Carter by Carter v. U.S. Steel Corp.*, 604 A.2d 1010, 1016–17 (Pa. 1992), which require the defendant to establish a "reasonable likelihood of prejudice." *Bomar II*, 104 A.3d at 1211. The state court concluded there was no reasonable likelihood of prejudice from a "report of an isolated, vague, and general threat conveyed by a neutral law enforcement officer to a single juror." *Id*. at 1212

**C.    Bomar Was Entitled to a Presumption of Prejudice Based on the Improper Communication, and Reasonable Jurists Could Debate the District Court's Ruling to the Contrary.**

The district court denied relief, concluding that Bomar had failed to show that the state court's resolution of the claim was contrary to or an unreasonable application of clearly established federal law. A118–19. Bomar filed a Motion to Alter and Amend Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure seeking reconsideration of this claim, or a COA. The district court failed to reconsider the matter or grant a COA. A241. For the reasons that follow, the district court's analysis of this claim, at both instances, was unreasonable, and this Court should grant a COA because clearly established federal law provides a presumption of prejudice to the defendant in such circumstances. Regardless, Bomar established prejudice on the record of this case.

In denying relief, the district court attempted to show that there is no clearly established Supreme Court precedent for applying a presumption of prejudice to the type of extraneous influence claim involved here. The court reasoned that the Supreme Court's cases are difficult to reconcile and do not provide a "clear or consistent path for courts to follow," particularly in the habeas context. A111–18.

To the contrary, the United States Supreme Court was clear in *Remmer* where it held that a presumption of prejudice governs circumstances like those presented here. In *Remmer*, an outsider offered money to a juror in exchange for a not-guilty

19

vote. *Remmer*, 347 U.S. at 228. The juror reported the incident, the trial court had the FBI interview the juror, and the FBI concluded that the remark was a joke. *Id*. The court took no further action and defense counsel only learned of this matter through news reports after the verdict. *Id*. The Supreme Court concluded:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id*. at 229.

In *Remmer*, the Supreme Court relied, in part, on its prior decision in *Mattox v. United States*, which held that private communications between jurors and third parties are forbidden and invalidate the verdict unless harmlessness is proven. 146 U.S. 140, 150 (1892). In *Mattox*, post-trial affidavits indicated that a bailiff had made comments about the defendant's guilt while the jury was deliberating, and the jury was exposed to newspaper coverage reinforcing the view of defendant's guilt. *Id*. at 142. The Supreme Court held that the district court's refusal to examine and hear the proposed evidence was error, and after examining the evidence itself, the Supreme Court held that prejudice had been demonstrated and remanded for a new trial. *Id*. at 150.

Although the district court considered both of these cases, it placed a heavy emphasis on the fact that these were supervisory cases, and that it was not clear that the presumption of prejudice would apply in a state-court proceeding. A112–13. The district court further noted that Bomar was provided a hearing in state court and prejudice was not found. *Id.* However, the mere occurrence of hearing is not adequate where that hearing did not provide Bomar a presumption of prejudice, and where the court made unreasonable factual determinations.

The district court then focused on *Smith v. Phillips*, 455 U.S. 209 (1982), a federal habeas case in which a sitting juror applied for employment in the District Attorney's Office. A114. The Supreme Court held that Smith's rights were adequately protected by an evidentiary hearing allowing him to show prejudice. *Phillips*, 455 U.S. at 215. Because the state court held a hearing in this case, the district court concluded that the state court's denial of Bomar's claim was not an unreasonable application of *Phillips*. A114. However, the district court's reliance on *Phillips* is misplaced: the underlying issue in *Phillips* was not third-party interference but rather a juror who failed to disclose information that might demonstrate bias. Additionally, the juror in *Phillips* was fully subject to *voir dire* which exposed his interest in a law enforcement career, and the fact that in his duties as a loss prevention officer he had encounters with the District Attorney's Office. The defense was aware of all of this information and allowed the juror to be seated

21

anyway. The bias at issue in *Phillips* is not comparable to that at issue here. The present case involves court security staff telling a juror of an outside threat against the jury during the course of a trial that linked the defendant to the threat's origin, and without knowledge of the defense or the court. Bomar's case is governed by *Mattox* and *Remmer*, which both concluded that a presumption of prejudice was appropriate in situations where extraneous third-party information was conveyed to a juror.

*Phillips* did not abrogate *Remmer*'s presumption of prejudice in cases of extrinsic influence. *See United States v. Console*, 13 F.3d 641, 666 (3d Cir. 1993); *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001); *see also Cunnigham v. Shoop*, 23 F.4th 636, 648–49 (6th Cir. 2022) (so opining, and collecting cases); *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992); *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984); *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir. 1983); *United States v. Bassler*, 651 F.2d 600, 603 (8th Cir. 1981). Even the district court acknowledged that this Court has applied the *Remmer* presumption in a habeas case. A230 (citing *Henderson v. DiGuglielmo*, 138 F. App'x 463, 467 n.5 (3d Cir. 2005). But the court did not explain why that presumption should not apply to Bomar.

Because the state courts did not provide the presumption of prejudice, the state court decision was contrary to or an unreasonable application of *Remmer*. As such,

Bomar has demonstrated, at a minimum, that the district court's ruling is "debatable amongst jurists of reason," as reasonable jurists could debate whether this claim should have been resolved "in a different manner," or reasonable jurists could conclude that this issue is "adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (quoting *Slack*, 529 at 484).

### D.    If Bomar Bears the Burden of Showing Prejudice, He Has Done So.

Even if Bomar were required to show a "reasonable likelihood of prejudice," the state court's application of that standard was itself unreasonable. The uncontroverted evidence established that a deputy told a sitting juror, during the course of the trial, that a death threat had been made against the jury. The deputy linked that threat to a gang from Philadelphia, and there was substantial evidence and testimony presented during trial connecting Bomar to Philadelphia.

The state court asserted that there was no likelihood of prejudice because (1) the "threat was vague," or "generic," (2) its origins were "unknown," i.e., there was no proof that Bomar or "'his people' were the source of the threat," and (3) "it was conveyed by a sheriff's deputy to a single juror, rather than communicated directly to the jury from the source of the threat, thus minimizing its inflammatory nature." *Bomar II*, 104 A.3d at 1211–12. The state court's surmise that these aspects of the threat minimized or eliminated the likelihood of prejudice was an unreasonable determination of the facts, 28 U.S.C. §§ 2254(d)(2), (e)(1), as well as an

23

unreasonable application of clearly established federal law in light of the state court's failure to consider the "totality of circumstances" at trial. *Sheppard v. Maxwell*, 384 U.S. 333, 352–53 (1966); *United States v. Moss*, 410 F.2d 386, 388 (3d Cir. 1969).

There is nothing vague about the term "death threat," and the circumstances recounted by Mertz confirm that law enforcement took this threat seriously. Mertz recalled that the law enforcement personnel were all armed and wore bullet proof vests. A242. Furthermore, Mertz observed that when the jurors were caught in heavy traffic, law enforcement got them out of the traffic jam by driving across the median. This led Mertz to comment: "They made sure we weren't sitting ducks." A243. Here, the third-party was a trusted member of law enforcement whose service Mertz appreciated. A242. The conversation itself and the other circumstances convinced Mertz that the law enforcement officers took the death threat against the jury seriously.

The fact that the external contact involved a threat raises the stakes considerably. The effect of a threat on jurors must be carefully scrutinized. For example, in *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993), a juror received a telephone call at home, in which the caller said, "I know where you live." *Id.* at 846. The juror asked other jurors if they had received such a call; none had. *Id.* The court excused the threatened juror, inferring that the threat was likely tied to jury duty. *Id.*

at 847. Here, the threat was *directly* tied to the jury service of Mertz as he was told that there was a death threat against the jury.

It makes no difference that the Philadelphia-gang threat was conveyed only to a single juror, notwithstanding the state court's reliance on that fact. *See Bomar II*, 104 A.3d at 1212. The relationship between Mertz and the deputy "was one which could not but foster [Mertz's] confidence in those who were [his] official guardians during the entire period of the trial." *Turner v. Louisiana*, 379 U.S. 466, 474 (1965). Additionally, Bomar was entitled to be tried by 12, not fewer, impartial and unprejudiced jurors. *Parker v. Gladden*, 385 U.S. 363, 366 (1965). The fact that only a single juror was exposed to an improper extraneous communication does not minimize its significance or alleviate the prejudice. "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox*, 146 U.S. at 150.

The likely and immediate supposition for anyone hearing such a threat would be that it was instigated by or on behalf of Bomar. The evidence adduced at trial regarding Bomar's ties to Philadelphia would further cement that belief. There was a heavy focus on witnesses and evidence that could connect Bomar to the Philadelphia area. This included testimony from a former employer of Bomar who conducted private investigations in and around Philadelphia. NT 9/24/98 at 14–24.

There was additional testimony that Bomar had taken a former romantic partner to meet a friend in North Philadelphia, as well as testimony that Bomar had given statements to police noting his connections to places in and around North Philadelphia, including family who lived in the area. NT 9/24/1998 at 24–41; NT 9/23/98 at 128–29, 133–34, 152. Finally, there was testimony that police decided to question Bomar in connection with the death of Aimee Williard due to another incident in Philadelphia on May 29, 1997. *See* NT 9/22/98 at 230–34; NT 9/23/98 at 156–57.

In short, there was extensive evidence linking Bomar to the Philadelphia area including testimony that he had family, friends, and associates in the area. The deputy conveyed that the threat came from a "a gang in Philadelphia." A242. The district court minimized this danger by noting there was no evidence that Bomar was in a gang or that he acted with anyone else in this matter. A232. But the trial record proves otherwise in multiple respects.

First, there was testimony from O'Donald, a key prosecution witness, that Bomar had confessed to the crime and used the phrase "we" when discussing the crime. NT 9/28/98 at 252. O'Donald alleged that Bomar told him "we did whatever we wanted with her, she did whatever we told." *Id*. Bomar also told O'Donald, "if everybody does what I tell them I'll be alright." *Id*. at 254. Finally, when asked why he did not originally tell law enforcement everything Bomar had said, O'Donald

stated, "Because he was referring to we and I didn't know who we was or if he had we on the street, and I have a family on the street." *Id*. at 255. O'Donald noted that he was afraid for his sister's safety as Bomar had told him that he had people out there. *Id*. at 256. As such, the jury heard evidence that Bomar "had people" and others feared retaliation by those associated with Bomar.

Second, Mary Rumer testified that Bomar's family had taken her on a week-long trip to various places to keep her from talking to media and the police. NT 9/25/98 at 164, 210. She would ultimately tell law enforcement and the jury that Bomar had admitted to killing Ms. Willard. *Id*. at 145. Rumer further testified that she had initially lied to the grand jury because she was afraid of Bomar. *Id*. at 244. She also told police that Bomar would kill anyone who crossed him. *Id*. at 237. The Commonwealth highlighted this threat in its guilt-stage closing argument when discussing why the prosecution had provided living expenses to Rumer: "We were aware of the threats that he made that if anyone crossed him, he would kill them. The Commonwealth wasn't taking that chance." *Id.* at 101.

Third, the simple fact a deputy conveyed this information would give it great weight. *See Gladden*, 385 U.S. at 365 ("the official character of the [deputy] . . . beyond question carries great weight with a jury"). Even the district court acknowledged that "an objective typical juror may have regarded the deputy as a credible source of information about the threat." A233. The district court

acknowledged both that the report of a death threat would be unsettling to an objective juror and that it was improper for the deputy to convey such information. A237–38.

Fourth, the Commonwealth continued to hone its theme that Bomar was a danger in its penalty phase closing argument, ". . . it's not simple enough just to conclude that society's going to be protected if you vote to impose life imprisonment without parole. It sounds good, but remember, if you do that the Defendant will encounter corrections officers, counselors, other inmates, other employees at whatever state institution that he's sent to, and he has demonstrated from his past criminal record that jail won't stop him, parole won't stop him. There's only one way to stop Arthur Bomar." NT 10/5/98 at 150–51.

The Commonwealth made it clear throughout trial that it believed Bomar was dangerous and posed a very real threat to others. Based on these representations, a reasonable juror would also conclude that Bomar was dangerous, made threats, and had the ability and people to assist in seeing out those threats. Bomar was left to be tried and sentenced by one or more jurors who personally feared him. The Court should certify his claim for relief.

## II.    REASONABLE JURISTS COULD DEBATE WHETHER THE COMMONWEALTH VIOLATED BOMAR'S DUE PROCESS RIGHTS BY PRESENTING FALSE AND MISLEADING TESTIMONY AND SUPPRESSING EXCULPATORY EVIDENCE.

At trial, Commonwealth witnesses David O'Donald and Quincy Williams testified about graphic admissions Bomar made to each of them while incarcerated together describing the rape and murder of Aimee Willard. They testified that they had not been offered anything in exchange for their testimony but were testifying out of concern for others and with no expectation of leniency or benefit. Those statements regarding their motivations were false, and the prosecutor knowingly let their testimony go uncorrected. Moreover, the prosecutor relied on these false statements and these purported admissions in his arguments to the jury.

In reality, both O'Donald and Williams had agreements and/or understandings with the Commonwealth and lied about them at trial. Reasonable jurists would debate whether the Commonwealth's failure to correct this false testimony and suppression of evidence violated Bomar's due process rights. *See Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963).

### A.    Reasonable Jurists Could Debate Whether the Commonwealth Violated Bomar's Due Process Rights by Presenting O'Donald's False and Misleading Testimony and by Suppressing its Promise to Him.

[W]e did whatever we wanted with her, she did whatever we told, and when we were done I almost took her head off, and we crammed a tree branch up her cunt and then we dumped the bitch.

29

NT 9/28/98 at 252. These are the words that Bomar allegedly said when O'Donald asked him about his involvement in this case. O'Donald further testified that Bomar admitted that "I grabbed the bitch and she said please don't do this." *Id.* He testified that Bomar told him that he told Aimee Willard, "I'll do whatever the fuck I want, just shut up." *Id.* And that "[s]he said just don't kill me, I'll do anything." *Id.* O'Donald testified that he "said he took her and did whatever he wanted in a van. He used the words we did whatever we wanted with her . . . ." *Id.* This horrific account of the crime was one of the last things the jury heard before it decided Bomar's guilt and punishment. NT 9/30/98 at 107–08, 135–36 (guilt); NT 10/5/98 at 151–52 (penalty).

### 1. The Commonwealth presented false and misleading evidence and suppressed favorable evidence.

O'Donald was in federal custody, awaiting sentencing on armed bank robbery charges to which he had pleaded guilty. NT 9/28/98 at 246–47. He offered to be transferred to the Montgomery County Prison – where Bomar was being held on other charges – "[t]o see if Arthur Bomar had anything to do with the Aimee Willard killing." NT 9/28/98 at 245, 268–69. O'Donald was already cooperating with the federal government under a plea agreement prior to his cooperation in Bomar's case. *See* PCRA Ex. 13 (Guilty Plea Agreement (Mar. 4, 1997)). In return, the Government agreed to file a downward departure motion if it determined O'Donald "fulfilled his obligations of cooperation." *Id.* ¶ 5.

In June 1997, O'Donald's sentencing hearing was postponed in order for him to gather information on Bomar. NT 4/22/98 at 65. On July 2, 1997, before being transferred, O'Donald met with federal and county law enforcement officials, including prosecutors from the Delaware County District Attorney's Office and Pennsylvania State Police investigator Tedescung Bandy. NT 9/28/98 at 244–47, 263. Days later, Bomar allegedly said to O'Donald: "If I . . . had disposed of the body there would be no problem. . . . No body, no Grand Jury indictment." *Id.* at 250–51. Later the same day, Bomar allegedly admitted to the aggravated version of the killing described above. *Id.* at 252.

O'Donald then met with law enforcement agents and gave a written statement about his initial conversation with Bomar. Two months later and a few weeks before his federal sentencing, O'Donald asked to meet with law enforcement again. *Id.* at 280. Only then did he convey that Bomar had admitted he brutalized and killed Ms. Willard. *See id.* at 255–57, 279–82.

Before his sentencing, federal prosecutors filed a downward departure motion that alluded to O'Donald's cooperation in the Bomar matter, noting that he "he had provided information in an ongoing local criminal investigation," which had "confirmed the direction that the investigation had taken." PCRA Ex. 15 (Downward Departure Motion ¶ 7). During the sentencing, the AUSA asked to advise the court of the nature of the cooperation in the Bomar case at side bar. PCRA Ex. 16 (NT

10/17/97 at 15–16, 20). The court granted the Government's motion and sentenced O'Donald to 17 years, about half of the applicable Guidelines sentence. PCRA Ex. 16 (NT 10/17/97 at 22–23); *see* NT 4/22/98 at 33.

O'Donald then testified against Bomar at a suppression hearing, NT 4/22/98 at 7–111, and at trial, NT 9/28/98 at 244–98. O'Donald told the jury that he agreed to cooperate against Bomar because of his concern for his sister, and that he was not promised anything in return for his cooperation. NT 9/28/98 at 256. While his Bomar-related cooperation was brought to the attention of his federal judge, he testified that the reduction from 34 to 17 years was done in exchange for his cooperation with the federal authorities regarding additional bank robberies and that "[t]o [his] understanding, [his cooperation in the Bomar case] didn't have any impact" on the sentence he would receive in federal court. *Id.* at 261, 285–86, 295–96; *but see id.* at 297 (noting that he believed the level of his cooperation in the Bomar case "might have" had some impact on the sentence he received). The trial court instructed the jury to receive O'Donald's testimony with caution because he believed his level of cooperation could impact the sentence he would receive in federal court. NT 9/30/98 at 160.

Ten days after Bomar was sentenced to death, the Government filed another sentence reduction motion. PCRA Ex. 17 (Rule 35 Mot. (Oct. 15, 1998)). The motion asserted that O'Donald was entitled to a further reduction in the sentence

based upon his cooperation in the Bomar case. *Id.* at 3. The district court held a hearing on the motion. Referring to the October 17, 1997 side bar, the court stated:

> I permitted the Government and the defense counsel to come up to side bar and they told me of this confidentially, under seal, you know, of this [Bomar-related] cooperation that was hoped that you would be able to give, so I was aware of it, but of course, nobody knew at that time what the extent of it would be or the circumstances and as I understand it, that's why we're back here at this time on Motion of the Government.

PCRA Ex. 18 (NT 1/7/99 at 19). The Court granted the Government's motion and reduced O'Donald's sentence from 17 to 14 years, based on his Bomar cooperation. *Id.* at 29; *see also* PCRA Exh. 21 (NT 8/23/00 at 24).

In light of a subsequent sentence reduction motion based on new cooperation unrelated to Bomar, the Court further reduced O'Donald's sentence to 13 years. PCRA Ex. 21 (NT 8/23/00 at 4). Unsatisfied, O'Donald filed a pro se reconsideration motion, in which he acknowledged that he had an agreement with law enforcement officials that his Bomar cooperation would result in a "substantial" reduction. PCRA Ex. 20 (Mot. at 1).

Just before the PCRA evidentiary hearing took place in this case, the Delaware County District Attorney's Office turned over a document prepared by one of the trial prosecutors, ADA Joseph McGettigan, entitled "Points to Cover Re Prison Informant," that he went over with O'Donald at the July 2, 1997 meeting. PCRA Ex. 92 (McGettigan Stip. at 2); *see also* NT 1/15/09 at 127; *id.* at 11, 13–15 (O'Donald testifying similarly); A244–46.

33

The Points to Cover document refutes the Commonwealth's statement to the jury that O'Donald's motivation to testify was not based on an expectation of further leniency. Paragraphs seven through nine show quite the opposite:

> 7. Do you understand that since I am not a member of the United States Attorney's Office that I have no authority or capacity to appear in court to make a recommendation to the court which shall sentence you?
>
> 8. Do you understand that I will have the ability to provide information to the United States Attorney's Office and to any other relevant party as to my opinion of the sincerity and candor of your cooperation?
>
> 9. Do you understand that any benefit that you may receive for your cooperation is *not* dependent on any information you may or may not provide, but will flow solely from your sincere and candid cooperation in terms of your willingness to serve as a "listening post" for [Bomar]?

PCRA Ex. 79 (Points to Cover) (emphasis in original); A244–45.

The Points to Cover document shows an "understanding" between O'Donald and the prosecution "that if he cooperated in our prosecution of Arthur Bomar that cooperation would be brought to the attention of the Federal Judge who imposed his sentences." *See* NT 1/15/09 at 131 (testimony of Corp. Bandy). Likewise, O'Donald testified at the PCRA hearing that he was promised that the federal prosecutors would file a motion for another sentence reduction after he testified in Bomar's case. NT 1/15/09 at 27–28. He also confirmed that his cooperation in Bomar's case was always aimed at reducing his federal sentence. *Id.* at 86.

Following trial, ADA McDevitt effectuated this understanding and promise. He reviewed the Government's draft sentence reduction motion and spoke to the

federal prosecutor about O'Donald's cooperation. *See* NT 1/16/09 at 35–40. The federal prosecutor then conveyed Bomar's cooperation to the federal court. *See* PCRA Ex. 18 (NT 1/7/99 at 24) ("I have spoken to Mr. McDevitt, Your Honor, several times, and he has expressed his thankfulness for the defendant's cooperation.").

There is no dispute that the Commonwealth reviewed the contents of the Points to Cover document with O'Donald prior to trial but did not disclose its contents or the document itself to defense counsel prior to trial. PCRA Ex. 92 (McGettigan Stip.). The Points to Cover document contained a "possible agreement or arrangements for prosecutorial leniency," *Giglio v. United States*, 405 U.S. 150, 151 (1972), and an "implication" that cooperation "would [be] reward[ed]," *id.* at 153 n.4. It should have been turned over to the defense.

The Supreme Court has been clear that this type of impeachment evidence must be disclosed. In *United States v. Bagley*, the prosecution "failed to disclose that the possibility of a reward had been held out to [two witnesses] if the information they supplied led to the accomplishment of the objective sought to be obtained . . . to the satisfaction of [the Government]." 473 U.S 667, 683 (1985) (quotation marks omitted) (second alteration in original). The Supreme Court held that, although the witnesses were not "guaranteed [anything] through a . . . binding contract," and there was no "promise of reward," the prosecution still needed to disclose to the

defense that it induced the witnesses to testify by holding out "the *possibility* of a reward" that was "expressly contingent on the Government's satisfaction with the end result." *Id.* at 683–84.

Likewise, in *Wearry v. Cain*, the prosecution failed to disclose that its witness "twice sought a deal to reduce his existing sentence in exchange for testifying against [the defendant]" and that police investigators told the witness "they would 'talk to the D.A. if he told the truth.'" 577 U.S. 385, 390 (2016) (quoting Pet. for Cert. 19 (quoting police notes)). The Supreme Court held that the prosecution had a duty under *Brady* to disclose the witness's efforts to obtain leniency and the promise from police. *See id*. at 388–90; *see also Giglio*, 405 U.S. at 151. Here, the understanding between the prosecutor and O'Donald was nearly identical to the favorable evidence in *Wearry*. O'Donald heard directly from the prosecutor that there would in fact be a benefit to testifying – the prosecutor would relay his cooperation to the federal prosecutor. O'Donald was also promised that the federal prosecutors would file a motion for another sentence reduction after he testified in Bomar's case, NT 1/15/09 at 27–28, which is exactly what happened. This promise, too, should have been disclosed. The fact that O'Donald's and the prosecutor's understanding did not specify a particular benefit to O'Donald "served only to strengthen any incentive to testify falsely in order to secure a conviction." *Bagley*, 473 U.S. 683.

Aware of this understanding and promise, the prosecution nevertheless elicited false testimony from O'Donald that he came forward and was cooperating with law enforcement out of concern for his sister and that he had not been "promised anything" in return for his "cooperation in this case." NT 9/28/98 at 256. In his closing, the prosecutor told the jury:

> So when O'Donald comes into court here, he's already been indicted, he's already been sentenced in federal court. So what's his motivation to testify in this trial? He was sentenced to 17 years, which he's not happy with; *he thought he might get some assistance for cooperating in this case*; he's not happy with the sentence that he got and he's appealing it. *When I called his name and he came through that door, he could have told me to pound sand*.

NT 9/30/98 at 105 (emphasis added). Not only did the prosecutor not correct the false testimony but he capitalized on it, portraying O'Donald as cooperating without inducement and dismissing the possibility of future inducement. ADA McDevitt even told the jury that rather than benefitting from his cooperation, O'Donald cooperated "at great risk to his personal safety and possibly his own life." *Id.* at 106. The jury did not know there was an understanding that the prosecutor would report to federal prosecutors who could then seek *another* sentence reduction.

**2.    The uncorrected false testimony and the undisclosed impeachment evidence was material to the guilt- and penalty-phases.**

O'Donald's testimony provided a sensationalized and aggravated account of the crime allegedly from Bomar himself. It depicted a callous predator with no

regard for human life. The prosecutor buttressed O'Donald's credibility with the false testimony that he had nothing to gain by testifying, then relied on that testimony in arguments to the jury. The resulting errors infected both phases of Bomar's trial.

### a)   Penalty-Phase Materiality

The materiality of evidence "is best understood by taking the word of the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 444 (1995). In his opening statement, the prosecutor explained to the jury that for the aggravating circumstance of the killing being committed in the perpetration of the felony of rape and kidnapping, "I'm going to move to incorporate the whole record of the trial that you've already heard into this hearing, so that you can consider all of the evidence that you've heard over the past two weeks concerning the killing of Aimee Willard in support of that aggravating circumstance." NT 10/1–2/98 at 39–40. This included O'Donald's incendiary testimony of Bomar's gruesome account of his crimes. It also included a photograph of the victim's body with a branch between the legs, which, in light of O'Donald's testimony, the prosecutor deemed "one of the most compelling pieces of evidence in th[e] case." NT 9/30/98 at 107.

The Commonwealth continued with the same theme in closing:

> You recall the testimony of inmate David O'Donnell [sic] Defendant's brother-in-law, who testified that after Amy had been abducted from the ramp, before her body was found on the lot at 16th and Indiana, she was alive. She was alive long enough to plead with Arthur Bomar not to kill her. Not to do those horrendous, horrible acts that he inflicted

38

upon her. You should show Arthur Bomar the same sympathy, the same mercy, he showed to Amy Willard.

NT 10/5/98 at 151. The jury found that the aggravating circumstances outweighed the "catch-all" mitigating circumstance, i.e., any other evidence of mitigation concerning Bomar's character and record and the circumstances of his offense. *Bomar I*, 826 A.2d at 839. The jury considered Bomar's "apparent remorse, character, dysfunctional childhood/family life and mental ability" in considering the catch-all mitigator. NT 10/5/98 at 200.

The importance of O'Donald's testimony was not lost on the Commonwealth. As it later confirmed, Bomar's convictions were "at least in part based upon [O'Donald's] testimony." PCRA Ex. 17 (Rule 35 Mot. ¶¶ 7–9, Oct. 15, 1998). In fact, the Government's request for a sentence reduction for O'Donald was "based upon his substantial assistance in [Bomar's] . . . prosecution." *Id.* at ¶ 3; *see* PCRA Ex. 86 (Bomar prosecutors confirmed Rule 35(b) motion's accuracy); NT 1/16/09 at 35–37; *see also* NT 1/7/99 at 24.

*Napue* requires relief if there is "any reasonable likelihood" that the false testimony would have "affected the judgment of the jury." 360 U.S. at 271; *accord Giglio*, 405 U.S. at 154. "[T]he materiality standard for false testimony is lower, more favorable to the defendant, and hostile to the prosecution as compared to the standard for a general *Brady* withholding violation." *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 152 (3d Cir. 2017). Otherwise stated, the prosecution's

knowing use of false testimony generally invalidates the defendant's conviction or sentence unless the error is harmless beyond a reasonable doubt. *Bagley*, 473 U.S. at 679 n.9; *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (reversal is "virtually automatic").

In *Haskell*, "a key witness," who "provided strong evidence that [the defendant] was the shooter," testified that she "expected nothing in return for her testimony," when in fact she "expected and eventually received favorable treatment at her sentencing for her [c]ounty charges." 866 F.3d at 146. The Commonwealth knew the witness's testimony was false and failed to correct it. *Id.* As the Commonwealth put it in its closing, "this [is] valuable testimony." *Id.* (internal quotations and citation omitted) (alteration in original). And the Commonwealth vouched for the witness's credibility, "only emphasiz[ing] her importance." *Id.* This Court found that given the witness's central role, "knowledge of the benefit she received in exchange for her testimony—substantial help with her own pending criminal charges—poses a reasonable, and significant, likelihood of affecting the judgment of the jury." *Id.* (citing *Napue*, 360 U.S. at 270). As in *Haskell*, here, the Commonwealth "present[ed] lies told by its own witness and then vouche[d] for and relie[d] on that witness's supposed honesty in its closing." The Commonwealth elicited the false testimony that O'Donald expected nothing in exchange for his testimony and vouched for his honesty. NT 9/30/98 at 105.

Moreover, O'Donald's testimony "was an important part of the prosecution's case[.]" *Glossip v. Oklahoma*, 145 S. Ct. 612, 628 (2025). O'Donald's testimony was the sole evidence connecting the branch found between the decedent's legs with Bomar's alleged account. The body of Willard was found in a "brushy area," NT 9/22/98 at 220, under a tree whose "branches sloped down to within about a foot of the ground," *id.* at 187. The medical examiner confirmed that there was "[a]bsolutely no evidence that [the branch] was inserted into her vagina." NT 9/23/98 at 95. Only with O'Donald's testimony did a photograph of the victim's body with a branch between the legs become "one of the most compelling pieces of evidence in th[e] case." NT 9/30/98 at 107 (prosecutor's closing); *see id.* at 107-08 (noting the branch had no significance until O'Donald's account). Given O'Donald's central role in the prosecution's case for death, knowledge of the benefit he received in exchange for his testimony poses a "reasonable, and significant, likelihood of affecting the [sentencing] judgment of the jury." *Haskell*, 866 F.3d at 146.

Bomar also demonstrates *Brady* prejudice, that is, a "reasonable likelihood" that he would have been sentenced to life if the O'Donald evidence had been disclosed. *Bagley*, 473 U.S. at 682 (internal quotation and citation omitted). The prosecution's closing highlighted what it thought important for the case and in turn what the jury likely considered in making its sentencing determination. *See Banks v. Dretke*, 540 U.S. 668, 700–01 (2004) (noting the testimony that could have been

41

further impeached "was the centerpiece of Banks's prosecution's penalty-phase case"). ADA McDevitt ended his closing by asking the jury to recall O'Donald's testimony about "those horrendous, horrible acts that [Bomar] inflicted upon [Aimee Willard]," to show Bomar had no regard for human life and deserved death. NT 10/5/98 at 151. "The stress placed by the prosecution on this part of [O'Donald's] testimony, uncorroborated by any other witness" in its closing is indicative of its importance to the prosecution's case for death. *Banks*, 540 U.S. at 700.

"Had jurors known of [O'Donald's] continuing interest in obtaining [the Commonwealth's] favor, . . . they might well have distrusted [his] testimony, and, insofar as it was uncorroborated, disregarded it." *Id.* at 701. Such disregard (or discounting) would have affected the jury's weighing of the aggravating and mitigating circumstances, particularly the aggravator that the killing was committed in perpetration of a rape and kidnapping and the catch-all mitigator considering Bomar's apparent remorse and character. *See Cone v. Bell*, 556 U.S. 449, 475 (2009). Impeaching O'Donald's testimony would have lessened "those things about the Defendant and the killing which make this crime more terrible and more deserving of the death penalty," NT 10/5/98 at 149, and increased the weight of the mitigating circumstance related to Bomar's character and remorse.

### b)   Guilt-Phase Materiality

O'Donald's false testimony also justifies guilt-phase relief under *Napue*. O'Donald's alleged admissions were the only direct evidence offered by the prosecution to show malice and specific intent:

> And it's a case of First Degree Murder, because it's a killing with somebody's specific intent to kill and it's a killing done with malice. Malice is the state of mind the killer must possess, in order for a case to be murder. And the judge will give you a specific definition of what the word malice means in the law. But again, *this picture of Amy* [sic] *with the tree branch between her legs shows you exactly the state of mind Arthur Bomar has when he killed Amy* [sic] *Willard.* He had that malicious state of mind required to make it murder."

NT 9/30/98 at 136 (emphasis added). As the Supreme Court observed in *Glossip*, "[h]ad the prosecution corrected [the witness] on the stand, his credibility plainly would have suffered. That correction would have revealed to the jury not just that [the witness] was untrustworthy . . . but also that [he] was willing to lie to them under oath. Such a revelation would be significant in any case . . . ." 145 S. Ct. at 628. Where such a revelation affected the credibility of the witness whose account formed the sole basis for the "one of the most compelling" parts of the case, there is a sufficient possibility that the false and uncorrected testimony "affected the judgment of the jury." *Napue*, 360 U.S. at 271; *accord Giglio*, 405 U.S. at 154.

For similar reasons, the suppressed impeachment evidence could reasonably be taken to put the case "in such a different light as to undermine confidence in the verdict" under *Brady. Kyles*, 514 U.S. at 435. Without O'Donald's testimony "about

what Arthur Bomar told O'Donald that he has done with this stick," the prosecutor would have had no – or at the very least, less credible – evidence to support O'Donald's highly aggravated version of the crime and no direct evidence of malice and specific intent. Had O'Donald been impeached with the existence of an understanding with the prosecution, that evidence "would have dampened the prosecution's zeal in urging the jury to bear in mind" his disturbing description of the offense. *Banks*, 540 U.S. at 699.

### 3.    The District Court's Rulings

The district court denied relief for two reasons. First, it deferred under 28 U.S.C. §§ 2254(d)(2) and (e)(1) to the trial-level PCRA court's factual finding that O'Donald did not have an "agreement" with the prosecution. Second, the district court concluded that "Bomar has not shown he was prejudiced by the nondisclosure or by the prosecution's failure to correct O'Donald's false testimony." A70. Reasonable jurists could debate both aspects of the district court's reasoning.

### a)    Undisclosed Promise or Agreement

Both the district court and the Pennsylvania Supreme Court agreed that the Points to Cover document "arguably created an understanding." A70; *Bomar II*, 104 A.3d at 1192 (noting "other evidence strongly suggests the existence of . . . an agreement" between O'Donald and prosecutors for a reduced sentence). The PCRA court found that there was no specific "agreement" under which state or federal

prosecutors promised O'Donald that an additional sentence-reduction motion would be filed in his federal case if he testified at Bomar's trial. *Commonwealth v. Bomar*, No. 5045-97, 2012 WL 9515416, at *20 (Del. Cnty. Ct. Comm. Pls. Sept. 4, 2012). Nevertheless, the Pennsylvania Supreme Court did not "reach a definitive conclusion as to whether or not an agreement existed." *Bomar II*, 104 A.3d at 1192. The district court concluded that "the Pennsylvania Supreme Court's comments did not sufficiently undermine the PCRA court's decision on the agreement element so as to deprive that decision of the deferential standard of review under § 2254(d)(2)." A64. The district court erred.

As the district court acknowledged, the Pennsylvania Supreme Court "characterized the evidence suggesting the existence of an agreement as 'strong[],'" *Id.* (quoting *Bomar II*, 104 A.3d at 1192). The Pennsylvania Supreme Court noted several circumstances that cast doubt on the PCRA court's no-agreement finding: (1) the Points to Cover document "discussed the prosecutor's ability to provide information to the United States Attorney's Office regarding O'Donald's cooperation," "noted that any potential benefit to O'Donald would flow from his willingness to serve as a listening post," and "characterized O'Donald's relationship with prosecutors as an 'understanding'"; (2) "at O'Donald's resentencing hearing, the federal prosecutor confirmed that O'Donald had a 'deal . . . with the federal government to cooperate in any and all investigations as . . . requested of

[O'Donald]'"; and (3) ADA McDevitt testified at the PCRA hearing that, following O'Donald's cooperation, he "'fully expected [O'Donald] to . . . return to Federal Court and ask the Judge to reduce his sentence from the 17 years.'" *Bomar II*, 104 A.3d at 1192. Shortly after Bomar's trial, federal prosecutors filed a Rule 35(b) Motion for Reduction of Sentence, and O'Donald's prison sentence was reduced from 17 to 14 years. *Id*. (citations omitted and alterations in original).

To determine the effect of these inconsistencies, the district court examined this Circuit's approach in cases where a state appellate court decides a claim on the merits without reaching an element of the claim that was addressed by a lower state court. The district court noted that "[i]n each of the[] cases, the Court of Appeals emphasized that the state appellate court's decision on the claim did not negate the lower state court's decision with regard to the element in question." A63 (citing *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 597 (3d Cir. 2015); *Collins v. Sec'y of Pa. Dep't Corr.*, 742 F.3d 528, 545-46 (3d Cir. 2014); *Bond v. Beard*, 539 F.3d 256, 289 (3d Cir. 2008)).

Here the state appellate court *did* negate the lower state court's decision. The Pennsylvania Supreme Court's decision explicitly "questioned [and] undermined the PCRA court's more specific rulings." *Collins*, 742 F.3d at 545–46. There is no other reasonable way to interpret the Pennsylvania Supreme Court's observation that "other evidence strongly suggests the existence of such an agreement." *Bomar II*,

104 A.3d at 1192. The district court reasoned that the state supreme court "specifically declined to decide" the issue of O'Donald's agreement. A64. But an appellate court need not adopt the opposite of a lower court's ruling in order to cast doubt on it. Contrary to the district court's reasoning, the Pennsylvania Supreme Court "directly and impliedly t[ook] issue with the relevant facts found by the [lower] [c]ourt." *Dickerson v. Vaughn*, 90 F.3d 87, 91 (3d Cir. 1996). These findings were not left undisturbed and are not entitled to a presumption of correctness.

In any event, Bomar's claims do not depend on a specific "agreement" between O'Donald and the prosecutors. O'Donald falsely denied the understanding that the parties had at the time of Bomar's trial, as explained above. That denial, worsened by the prosecution's exploitation of it, violates due process whether or not the parties' actual understanding involved specific terms or firm promises. *See Napue*, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). The same is true of Bomar's *Brady* claim. Even if O'Donald was not absolutely certain that prosecutors would seek a reduction of his sentence and did not know the size of any such reduction, that uncertainty "served only to strengthen any incentive to testify falsely in order to secure a conviction." *Bagley*, 473 U.S. at 683.

47

### b)    Penalty-Phase Materiality

Neither of the state courts addressed the materiality of the undisclosed impeachment evidence or the uncorrected false testimony as they related to Bomar's penalty phase. *See Bomar*, 2012 WL 9515416, at *21; *Bomar II*, 104 A.3d at 1194. Both the PCRA court and the Pennsylvania Supreme Court focused solely on materiality as to the guilty verdict. Thus, in assessing materiality at penalty phase, the district court's "review [wa]s not circumscribed by a state court conclusion." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (same). This Court should review the district court's decision on this prong of the claim de novo.

The district court's *Napue* materiality conclusion – that there is no reasonable likelihood O'Donald's false testimony affected the judgment of the jury – improperly ignored the effect of the prosecution's failure to identify and correct the falsity. Had the Commonwealth corrected O'Donald in open court, "that correction would have revealed to the jury not just that [O'Donald] was untrustworthy . . . but also that [O'Donald] was willing to lie to them under oath." *Glossip*, 145 S. Ct at 628. Certainly the Commonwealth could not have argued that O'Donald testified out of concern for his sister instead of in pursuit of a reduced federal sentence. The district court also wrongly dismissed the impact on the sentence had the jury rejected (or discounted) O'Donald's testimony and with it, the most disturbing facts in the

case. The prosecution itself urged the jury to consider O'Donald's description of Bomar's "horrendous, horrible acts" as reason to impose death: "You should show Arthur Bomar the same sympathy, the same mercy, he showed to Amy (*sic.*) Willard." NT 10/5/98 at 151. The district court applied *Napue*'s "lower, more favorable to the defendant, and hostile to the prosecution," standard, in name only. *Haskell*, 866 F.3d at 152. At the very least, reasonable jurists could disagree with the district court's conclusions.

The district court also determined that there was no *Brady* materiality "as to the aggravating factors on which the jury's death verdict was based." A83. The court found O'Donald's testimony relevant only to one of the aggravating factors – that the killing was committed in the perpetration of a felony (i.e., kidnapping and rape) – and discounted its value because the "Commonwealth presented ample other evidence of th[o]se crimes at trial." A84. In a footnote, the court mentioned in passing that O'Donald's testimony "also had no bearing on the mitigating factors argued by the defense," including "any other evidence of mitigation concerning Bomar's character in the record." A84 n.59. Acknowledging that "O'Donald's account highlighted Bomar's callousness," the district court found "the cruelty and brutality of the offense were clear from the other accounts of Bomar's admissions and the physical evidence," so much so that even if O'Donald's testimony were rejected altogether, it was not reasonably probable that the result at the penalty phase

would have been different. A84.

The district court erred in numerous respects. First, the court wrongly concluded that O'Donald's testimony had limited value to the aggravating circumstance that the crime was committed in the perpetration of a rape and kidnapping. The court's surmise is only true to the extent the jury was only counting aggravators and mitigators, not weighting them. In its instructions to the jury, the court explained: "In deciding whether aggravating circumstances outweigh mitigating circumstances, don't simply count them. *Compare the seriousness and the importance of the aggravating and mitigating circumstances.*" NT 10/05/98 at 181 (emphasis added). Bomar does not argue that the jury would not have found the aggravating circumstance, but that the undisclosed evidence would have lessened its weight.

In this case, the nature of the rape as described by O'Donald was of a different character – more detailed and inflammatory – than the evidence of Bomar's sperm found in the victim's body and the non-detailed confessions to Mary Rumer and Quincy Williams. Rumer's testimony on the topic only confirmed that Bomar told her he had sex with Aimee Willard but did not say where. NT 9/25/98 at 151. Likewise, Williams testified that "He has said he has molested her, had sex with her, or something like that," and that he believed Bomar said it occurred in the car. *Id.* at 52. Neither of these accounts came close to the chilling account O'Donald provided

50

to the jury.

Second, the court had no basis to conclude that O'Donald's uniquely brutal account of the crime that was purportedly personally disclosed by Bomar had no bearing on the jury's consideration of the catch-all mitigator and its weight, which included considerations of Bomar's apparent remorse and character. NT 10/5/98 at 200. It is reasonably likely that the language and manner of Bomar's purported admission to O'Donald more than a year after the crime could lead a juror to give less weight to his character and remorse as the prosecution urged. The district court erred in finding the evidence had "no bearing" on the mitigating factors argued by the defense.

Third, the district court wrongly used a sufficiency-of-the-evidence-like standard, pointing to other accounts of the crime, to deny the materiality of the impeachment evidence or its effect on the jury. The court ignored the prosecution's focus on the egregious facts O'Donald's testimony brought into the case, which were supported by no other evidence. They were so important to its case for death, that the prosecution ended its closing asking the jury to recall O'Donald's testimony describing the "horrendous, horrible acts that [Bomar] inflicted upon her." The prosecutor referred specifically to O'Donald's testimony because he alone had conveyed the most aggravated account of the crime in Bomar's purported own words. O'Donald's testimony enhanced the seriousness and importance of the

51

killing-in-perpetration-of-a-rape aggravating circumstance, and it reduced the weight of the defense's mitigating evidence of Bomar's remorse and character.

### c)    Guilt-Phase Materiality

Both the district court and the Pennsylvania Supreme Court found that even if there was an undisclosed agreement between O'Donald and the prosecution, Bomar was not prejudiced at his guilt phase by its nondisclosure under *Brady* or *Napue* because of the strength of the other evidence implicating Bomar and the fact that some impeachment evidence was already presented during trial. A70; *Bomar II*, 104 A.3d at 1192–94.

The Pennsylvania Supreme Court discounted the weight of the impeachment evidence at issue given that O'Donald had testified at trial that he had a plea agreement with federal prosecutors, that his cooperation in Bomar's case had been brought to the federal judge's attention during his sentencing, and that "a motion for further reduction of his sentence was pending," prompting the court to instruct the jury to view his testimony with caution. *See Bomar II*, 104 A.3d at 1192–93. Although the district court agreed with the Pennsylvania Supreme Court that the jury was aware that O'Donald hoped to (and did) benefit from his cooperation in the Bomar case, it acknowledged the possibility that "disclosure of this understanding would not have been merely cumulative but would have permitted the defense to show O'Donald had an ongoing interest in cooperating to obtain further intervention

with regard to his federal sentence." A77; *see also Bagley*, 473 U.S. at 683.

The district court nevertheless found that Bomar had not demonstrated that the state court's no-prejudice finding with respect to the guilt phase was contrary to or involved an unreasonable application of clearly established federal law. A77. Similar to the state court, the district court found that O'Donald's testimony, while it "strengthened the prosecution's case, . . . was not critical to convict Bomar, given the strength of the physical and forensic evidence and the other confession evidence." A83; *see Bomar II*, 104 A.3d at 1192–94.

The *Napue* and *Brady* materiality inquiries probe whether the defendant received a fair trial absent the undisclosed evidence. They are not answered by examining whether reasonable jurors *could* have reached the same verdict if fully informed of the suppressed materials. *See Kyles*, 514 U.S. at 434–35 & n.8. In *Kyles*, there was arguably "a mountain of direct evidence against [Kyles]." 514 U.S. at 464 (Scalia, J., dissenting). The suppressed evidence in *Kyles* called into question "the most damning physical evidence," the sufficiency of the investigation, and the candor of the principal police witness, but undermined the credibility of only two of the four eyewitnesses. *Id.* at 454. Yet, the Court did not ask whether the jury could have reached the verdict had the suppressed evidence been disclosed but instead whether "the government's evidentiary suppression 'undermines confidence in the outcome of the trial'" *Id*. at 434 (quoting *Bagley*, 473 U.S. at 678). Likewise, here,

despite the existence of other incriminating evidence, the suppressed evidence called into question what the prosecutor himself deemed "one of the most compelling pieces of evidence" and the candor of one of the Commonwealth's key witnesses.

Importantly, the prejudice to Bomar also must be evaluated with the lower *Napue* standard – whether there is "any reasonable likelihood" the non-disclosure could have *affected the outcome*. While the district court and state courts treated the *Brady* and *Napue* materiality inquiries as virtually identical, this is contrary to clearly established federal law. The *Napue* materiality standard is even lower, i.e., more defense-friendly, than the *Brady* materiality standard. To minimize the value of impeachment evidence that would have called into question the only evidence of such an aggravated account of the crime by referring to the existence of the other incriminating evidence ignores the prosecution's repeatedly-stated belief of its importance and the jury's being told it was the most compelling evidence. There is a reasonable likelihood that undisclosed impeachment evidence was material where it would have undermined the Commonwealth's most compelling and inflammatory evidence. *See Kyles*, 514 U.S. at 454. The district court's ruling on this claim is "debatable amongst jurists of reason," and COA should be granted on this claim.

**B.      Reasonable Jurists Could Debate Whether the Commonwealth Violated Bomar's Due Process Rights by Suppressing its Agreement with Williams and Presenting His False and Misleading Testimony.**

At trial, Quincy Williams testified for the Commonwealth that while incarcerated together, Bomar allegedly admitted that he killed and sexually assaulted Ms. Willard. NT 9/25/98 at 50–55.

**1.      The Commonwealth presented false and misleading evidence and suppressed favorable evidence.**

At the time Williams claimed to have spoken to Bomar in prison – June 1997 – he was facing charges of first-degree murder and third-degree murder, among others. NT 4/1/98 at 5. He gave a statement to detectives regarding purported admissions Bomar made to him in August 1997. *Id.* at 9–10. In March 1998, Williams pled guilty to voluntary manslaughter and gun possession, after the Commonwealth dropped the first- and third-degree murder charges. On April 1, 1998, Williams testified at Bomar's preliminary hearing. He testified that he had yet to be sentenced, but that it was an open plea and his maximum sentence was 12 ½ to 24 years. *Id.* at 42, 46. Following the preliminary hearing and prior to Bomar's trial, Williams was sentenced to 5 to 10 years. At the time, his sentencing judge was aware of his cooperation to date in the Bomar case. *See, e.g.*, PCRA Ex. C-5 (NT 7/21/98 at 82) (McDevitt testifying, that Williams "has been cooperative" every time Williams had been called upon by his office to cooperate); *id.* at 114 (Williams's

attorney arguing at sentencing that "[p]robably most importantly . . . is [Williams's] role in the prosecution of Mr. Bomar"). When asked by the judge if he understood that he may be giving up the effect further cooperation could have on his sentence, Williams stated that he was not going to testify at Bomar's trial. *Id.* at 15–16.

However, two months later, Williams did testify at Bomar's trial. Before he took the stand, the prosecutor claimed in his opening that "[t]here was no request from my office to give [Williams] . . . a break in return for his testimony." NT 9/21/98 at 87–88. And Williams testified that he did not ask for or receive anything in return for his testimony. NT 9/25/98 at 55, 57, 66. The court inquired directly whether he believed that if he cooperated with the Commonwealth and testified, things might be better for him in his own criminal case. He said no. *Id.* at 69. Mark Miller, the prosecutor who handled Williams's case in Montgomery County, also testified for the Commonwealth. Miller testified that the decision to drop the first- and third-degree murder charges was not based on Williams's cooperation in the Bomar case. *Id.* at 113–14. He confirmed that Williams's counsel had urged leniency on that basis at his sentencing, *id.* at 119, but recalled incorrectly that "the Judge specifically said that he was not considering any participation by Mr. Williams," *id.* at 120. *But see* PCRA Ex. C-5 (NT 7/21/98 at 123-25) (including no such statement by the judge). The court instructed the jury to receive Williams's testimony with caution. NT 9/30/98 at 160–61.

About a year after the trial, ADA McDevitt wrote the Parole Board in care of Williams's mother. He noted that he was the prosecutor in the Bomar case, was "personally familiar with the cooperation and assistance Mr. Williams provided to our successful prosecution of Bomar," and wanted to "inform [the Board] of the nature and extent of Quincy Jamal Williams' cooperation at great risk to his personal safety and well being in order to see that justice was served in this heinous killing of Aimee Willard." PCRA Ex. 87. Two years later, ADA McDevitt wrote two members of the Parole Board attaching his previous letter and confirming he authored it. *Id.*

In June of 2003, Williams wrote ADA McDevitt, asking "what happened to our deal about my parole and the deal I took [for] 5 to ten years." *Id.* ADA McDevitt responded to Williams, denying there was a deal and refusing to contact the parole board, despite having done so previously. *Id.* ("I did not agree to, and will not agree to contact the board on your behalf."). Williams served his entire sentence. NT 9/24/09 at 13.

In post-conviction proceedings in 2009, Williams testified consistent with his letter: that the Delaware County detectives and ADA McDevitt promised him that he would be paroled at his minimum sentence, i.e., they would write or call the parole board, in exchange for his testimony to "certain things about Mr. Bomar." NT 9/24/09 at 6–11. He stated that he testified at trial only because of that deal, *id.* at 12, that Bomar never told him anything about the case, and that it was all told to him

by the detectives and the prosecutor, *id*. at 21, 23. At the time of trial, he denied there

was a deal because that denial was itself "part of the deal." *Id*. at 23.

> **2.     The uncorrected false testimony and the undisclosed impeachment evidence was material to the guilt- and penalty-phases.**

While admittedly not as critical a witness as O'Donald, Williams also testified

that Bomar personally disclosed to him that he molested and killed Aimee Willard.

NT 9/25/98 at 50–52. According to the prosecutor, the information Williams

provided "would be useful information to the Commonwealth if he were to testify at

a trial." PCRA Ex. C-5 at 77–78 (Williams's sentencing transcript). During his

opening, the prosecutor even felt it important to emphasize for the jury that "[t]here

was no request made from my office . . . to give Williams a break in return for his

testimony in the Aimee Willard case. [His] case was decided on its merits, and with

no input for his involvement here in this case." NT 9/21/98 at 86–87.

In addition to its substance, Williams's testimony also corroborated the idea

that Bomar was talking to other inmates about the crime while in jail, bolstering

O'Donald's testimony. Had the jury heard the undisclosed impeachment evidence

for both O'Donald and Williams, it would have questioned the prosecutor's

investigation and conduct. *See Kyles*, 514 U.S. at 445 ("Damage to the prosecution's

case would not have been confined to evidence of the eyewitnesses, for [the

impeachment evidence] would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation, as well . . . .").

The cumulative effect of the undisclosed impeachment evidence as it relates to Williams and O'Donald, and the prosecution's failure to correct their false testimony was material under *Brady* and *Napue* to the guilt- and penalty-phases. *See Kyles*, 514 U.S. at 436.

### 3.    The District Court's Rulings

The state courts decided this aspect of the *Brady/Napue* claim on credibility grounds, finding Williams's PCRA testimony was not credible, and thus that there was no agreement between the Commonwealth and Williams. *See Bomar II*, 104 A.3d at 1193-94. The district court erred in finding the state courts' determination that there was no agreement between Williams and the prosecution reasonable.

The PCRA court found Williams's post-conviction testimony not credible because "he now hopes that by disavowing his prior testimony he will alleviate the consequences that remain" from being labeled a snitch. *Bomar*, No. 5045-97, 2012 WL 9515416, at *23. At the PCRA hearing, Williams testified to some of the adverse consequences of being labeled a snitch while in prison. He mentioned that he saw "the same trouble in [his] neighborhood" after being released. NT 9/24/09 at 68. When the court inquired, "Does that cause you any difficulty?" He said, "[y]eah, somewhat. Like, a lot of guys I grew up with don't trust me." *Id.* The state courts

and district court determined that Williams "may have falsely recanted in an effort to avoid the lingering consequences" of being labeled a snitch. A93.

Neither the state courts or district court acknowledged that such a determination suggested that Williams returned to court to commit perjury and risk being charged with a felony and facing prison time. Moreover, such an explanation ignores Williams's 2003 letter to McDevitt, which would not have impacted his reputation in the community. This one-sided evaluation of credibility was unreasonable, because the state court failed to consider all of the evidence bearing on it. *See Allen v. Stephan*, 42 F.4th 223, 252 (4th Cir. 2022) ("When a state court during post-conviction review ignores evidence in the record placed before it, its fact-finding process may lead to unreasonable determinations of fact under § 2254(d)(2).") (quotation omitted).

## III.   REASONABLE JURISTS COULD DEBATE WHETHER TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT MITIGATING EVIDENCE, INCLUDING EVIDENCE OF BOMAR'S BRAIN DAMAGE AND IMPAIRED JUDGMENT.

Faced with "patently grave" aggravating circumstances, *Bomar II*, 104 A.3d at 1204, trial counsel wished to explain Arthur Bomar's criminality to the sentencing jury through evidence of organic brain damage: "I believed that we had to find something tangible that the jury could hold onto, something concrete that could tell the jury why he did what he did." NT 11/6/08 at 73. But counsel's investigation of

relevant records and documents was incomplete. As a result, neuropsychologist Gerald Cooke testified to the *possibility* of organic brain damage, but he was unable to diagnose it to a reasonable degree of psychological certainty. Only on post-conviction review was Dr. Cooke able to consider neuropsychological findings from 1979 as documented in Nevada prison records, as well as lay witness accounts that Bomar's mother drank alcohol and got into physical fights while pregnant with him. And only with the cumulative weight of the newly-furnished evidence did Dr. Cooke finally diagnose the organic brain damage that so impairs Bomar's judgment.

The Court should grant a COA because the state court's ruling on the claim is both unreasonable and incomplete as found by the district court. Moreover, the district court's de novo review fails to grasp the multiple respects in which counsel's investigation of mitigating evidence was constitutionally deficient, as well as the ability of the forgone evidence to diminish Bomar's moral culpability in the eyes of one or more jurors.

### A.    The Underwhelming Trial Mitigation

At the penalty phase, Bomar's mother and half-brother briefly testified, but mostly expressed their disagreement with the verdict of guilt. Two acquaintances testified about Bomar's involvement in the church, and a third testified about his nice personality. A stranger testified that he returned her missing wallet. NT 10/5/98 at 83, 86, 92, 94, 97, 119–20.

Bomar's half-sister, Joyce Batchelor, testified about her childhood and the three years she spent living with her mother, Carrie Ganges, and Bomar's father, Arthur Bomar Sr. Her mother and Arthur Sr. argued and fought every day, even when her mother was pregnant with Bomar, and Arthur Sr. sexually abused Batchelor. She recalled fights when her mother took an axe to furniture and another time when she tried to burn the house down. Batchelor could not remember her mother ever holding Bomar. *Id.* at 106–12, 115, 117.

Dr. Cooke testified that Bomar had deficits in intellectual functioning beginning at a young age and that tests he administered suggested organic brain damage but were too incomplete to diagnose it with certainty. Dr. Cooke diagnosed Bomar with antisocial and borderline personality disorders. He was not asked by counsel about, and did not testify to, the significance of Bomar's life history, including the effects of neglect and abuse on Bomar. NT 10/5/98 at 50–55, 58. At sentencing, the trial court described Dr. Cooke's testimony as "not terribly compelling." NT 12/4/98 at 36.

### B.    Penalty-Phase Counsel Performed Deficiently.

Bomar's ineffective-assistance claim requires a showing that counsel's performance was objectively deficient under prevailing professional norms, and that there is a "reasonable probability" that at least one juror would have chosen a different sentence if not for counsel's errors. *Strickland v. Washington*, 466 U.S.

668, 688, 694 (1984). On the question of performance, capital counsel must conduct a "thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000). "[C]ounsel's general duty to investigate takes on supreme importance . . . in the context of developing mitigating evidence to present to a . . . jury considering the sentence of death." *Marshall v. Hendricks*, 307 F.3d 36, 99 (3d Cir. 2002) (citation omitted). Counsel must seek out "all reasonably available mitigating evidence," including information about "medical history, educational history, employment and training history, [and] family and social history." *Wiggins*, 539 U.S. at 524. Bomar's counsel was deficient by these measures.

### 1.    Counsel did not adequately investigate lay witnesses to Bomar's personal and family history.

Trial counsel blamed Bomar for her own inadequate investigation. She complained that Bomar did not provide background information about his childhood, "didn't want to participate in assisting [her]," and told his family not to discuss his childhood with anyone. *Bomar II*, 104 A.3d at 1202–03. Nevertheless, following the jury's guilty verdict, Bomar did not object to counsel's mitigation presentation at the penalty phase, which included the testimony of Dr. Cooke and several lay witnesses. *See* NT 10/05/98.

Contrary to trial counsel's opinion, "[I]t is not the duty of the defendant to provide information on mitigation to the lawyer; rather, it is the lawyer's duty to uncover it." *Bridges v. Beard*, 941 F. Supp. 2d 584, 615 (E.D. Pa. 2013) (citing *Bond*,

539 F.3d at 288); *see also Rompilla*, 545 U.S. at 381 (counsel performed deficiently even though defendant provided only "minimal" assistance, described his background as "normal," and actively obstructed the investigation "by sending counsel off on false leads"). More specifically, "a defendant's failure personally to inform his counsel of possible avenues of investigation does not absolve his attorney from pursuing those avenues, particularly where counsel is already aware of facts demonstrating that such an investigation may be fruitful." *Saranchak*, 802 F.3d at 595; *Bond*, 539 F.3d at 287–88. Counsel's blame-the-defendant approach is especially inappropriate when, as here, mental illness contributes to the client's "inability to remember certainly important events and to report those in some sort of coherent way." NT 7/17/07 at 6, 101–02, 126; NT 11/6/08 at 161–62.

Counsel unreasonably abandoned her investigation of Bomar's background after "having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Trial counsel's witness list consisted primarily of individuals suggested by Bomar and his half-sister: Willie Mae Bomar (sister), Alonzo Bomar (brother), Anna Wilson (aunt), Joyce Batchelor (half-sister), Joyce Bomar (ex-wife), Betty Ganges (half-sister), Terry Ganges (step-brother), Jerome Bomar (father's relative), Margaret Sherman (aunt), Lorraine Kirkland (half-sister), and Bomar's first ex-wife. PCRA Ex. 48 (Letter from trial counsel, July 28, 1998); NT 11/6/08 at 71, 87–89; NT 3/4/99 at 245. Of the named witnesses, counsel

64

spoke only with Bachelor. NT 11/6/08 at 31–33; NT 11/7/08 at 157; PCRA Ex. 12B (Lorraine Cotton Aff.) at 3; PCRA Ex. 12D (Bettie McCullen Aff.) at 5; PCRA Ex. 12H (Wilson Aff.) at 8.

Among other failures, trial counsel did not contact Anna Wilson (Bomar's aunt), despite the fact that she was Bomar's primary caretaker during the periods when his mother abandoned him as a child. PCRA Ex. 12H at 4–8. Wilson was also one of the initial names Bomar provided to counsel as a person she should contact. NT 11/6/08 at 71. Wilson lived in Reno, Nevada, for most of her adult life and could have been located easily. PCRA Ex. 12H at 8. She would have been willing to provide trial counsel all of the information that she provided to PCRA counsel if she had been contacted by trial counsel. *Id.*; NT 11/7/08 at 157. Counsel also failed to interview half-sisters Bettie McCullen and Lorraine Kirkland Cotton and Herbert Levy, the ex-husband of Bomar's mother. PCRA Ex. 12B at 1, 3; PCRA Ex. 12C (Levy Aff.) at 1–2; PCRA Ex. 12D at 1, 6. At the time of trial, McCullen was living in Philadelphia and would have been willing to share the information she provided to PCRA counsel. *See* PCRA Ex. 12D at 6; NT 11/7/08 at 157. Likewise, Cotton and Levy also would have been willing to provide the information that they provided to Bomar's PCRA counsel if they had been contacted at the time of trial. *See* NT 11/7/08 at 157; PCRA Ex. 12B at 3; PCRA Ex. 12C at 1–2.

65

Penalty counsel recognized that she was not getting "the full picture" or "the whole story" from Bomar and his family. A168, A171. But her efforts to obtain "all reasonably available mitigating evidence," *Wiggins*, 539 U.S. at 524, were materially incomplete. Counsel did not travel beyond Pennsylvania, even though numerous family witnesses resided in Nevada, Florida, and Louisiana. NT 11/6/08 at 22. Although counsel hired an investigation firm to locate and contact the witnesses, many such "contacts" were half-hearted and unsuccessful, such as unreturned telephone messages. NT 3/4/99 at 237–38, 249–54; NT 11/6/08 at 34–35, 107–09, 118.

The bulk of Bomar's relatives were entirely unaware of his trial until PCRA mitigation specialist Kathleen Kaib contacted them several years later. NT 11/7/08 at 144. Trial counsel's efforts fall considerably short of the "standard of care" for capital investigations. *Id.* at 124. That standard, Kaib explained, requires repeated visits with the defendant and his relatives alike:

> You have to spend a lot of time, make many trips to speak with the client and sometimes the family members to get them to open up because your job as a mitigation specialist is to really build rapport because you're asking them to talk to you about the most upsetting and traumatic things in their life and many times people block things out and of course haven't dealt with them for years and years.

*Id.*

### 2.    Counsel was deficient in obtaining relevant records and providing them to mental-health experts.

When investigating the defendant's state of mind, counsel must furnish the expert with relevant evidence, *Affinato v. Hendricks*, 366 F.3d 252, 260 (3d Cir. 2004), including "clinically significant 'red flags,' which a qualified expert would have found to require follow-up prior to sentencing." *Blystone v. Horn*, 664 F.3d 397, 421 (3d Cir. 2011). Counsel in this case failed to obtain records from several mental health professionals who had seen Bomar at different points in his life. These records were readily available to counsel, but she failed to provide them to the defense's mental-health experts.

Trial counsel was aware that Bomar had records from Aldie Counseling Center, where he was admitted as part of his probation following release from the Nevada Department of Corrections (DOC), but counsel unreasonably failed to provide an adequate release to the institution. As a result, counsel did not obtain the records until after the trial. NT 11/6/08 at 49–50, 99, 112–13. The missing records would have shown:

1.    Bomar was resistant to sharing any personal information. His counselor noted that "there may be some family secrets."

2.    Bomar was unable to complete testing due to extreme paranoia that his answers would be "used against him."

3.    Bomar was diagnosed with paranoid personality disorder.

67

4.      Shortly after Bomar was sent to live with his father, his father died of cancer, and Bomar "lived by himself" in Reno during high school.

5.      Psychological testing was recommended but never done.

6.      Bomar was suspected of having an impulse control disorder.

PCRA Ex. 36 (Aldie records). Mitigating in their own right, these records should have been provided to the defense's mental health experts, who would have used them to inform their diagnoses and testimony. PCRA Ex. 6 (Cooke Decl.) at 6.

Trial counsel also failed to obtain records from the Nevada DOC, including a neuropsychological evaluation conducted in 1979 by Dr. Robert Whittemore, which documented Bomar's cognitive impairments. The fact that Bomar was previously incarcerated in Nevada was well known to trial counsel and was used by the Commonwealth as evidence of aggravation. NT 11/6/08 at 169–71; PCRA Ex. 33 (Nev. DOC records). Counsel additionally failed to obtain a report by Dr. John Chappel, which was part of the Nevada court files and documented Bomar's problems with sequencing and memory, as well as his guardedness about his family history. NT 11/6/08 at 193–96, 268–69; PCRA Ex. 27 (Chappel Rep.).

Compounding her failure to obtain available mental health records from known institutions and provide them to the experts, counsel also failed to provide the experts with a number of critical records that she already possessed, including records from the Delaware County Prison relating to Bomar's pretrial suicide attempts. Those records documented Bomar's paranoia, delusions, and self-

destructive outbursts, as well as the large doses of sedatives and antipsychotic drugs he was receiving. Counsel similarly failed to provide Montgomery County Prison records to the experts, even though the records describe a suicide threat and extreme paranoia. NT 11/5/08 at 98–100; NT 11/6/08 at 185–87; PCRA Ex. 1 (Del. Cnty. Jail Records, notations of 1/6/98, 1/8/98, 1/17/98, 1/19/98, 1/21/98, 1/26/98, 2/1/98, 2/3/98, 2/4/98, 2/5/98, 2/6/98, 2/29/98, 3/1/98, 3/4/98, 3/9/98, 5/12/98, 5/13/98, 5/14/98, 5/19/98, 8/7/98, 8/20/98, 8/22/98, 8/26/98, 8/31/98); PCRA Ex. 34 (Mont. Cnty. Jail records). Counsel likewise withheld from her experts some of the most critical records from the Pennsylvania Department of Corrections, including documents describing Bomar's lapses in memory and bizarre behavior consistent with psychotic episodes. *See* PCRA Ex. 30–32 (correctional records) (*e.g.*, Pa. Dept. of Corr. Progress Notes (Sept. 22, 1997)).

The defense's experts were left materially ignorant of Bomar's clinical, psychological, and social history. By the time of trial, counsel could argue only that Bomar had an unspecified "mental disorder" and "may even have brain damage." NT 10/2/98 at 44. Dr. Cooke testified to the latter as a possibility. He explained that neuropsychological testing on Bomar "suggest[ed]" organic brain damage but were not conclusive. NT 10/5/98 at 48–50. Unable to diagnose a cognitive disorder to a reasonable degree of medical certainty, Dr. Cooke stated that Bomar "perhaps" had such brain damage but it was "up to the jury." *Id.* at 54.

Trial counsel once again blamed Bomar for the deficiency in her evidence. Bomar had been unable or unwilling to complete some of the testing and did not provide sufficient effort for the results to be valid. NT 11/6/08 at 151–57. Among other difficulties, Bomar was "extremely uncomfortable" with a test that required him to wear a blindfold, and he became frustrated by his limited block-building abilities. *Id.* at 154–56. Counsel complained that Bomar did not cooperate. NT 3/4/99 at 246–48, 260–61; NT 11/06/08 at 101. Counsel did not grasp that Bomar's limited ability to cope with the testing was itself the result of his brain impairments. NT 7/17/07 at 66–67, 100–02, 126; NT 11/6/08 at 156; NT 7/28/10 at 99–100.

### C. Bomar Was Prejudiced by Trial Counsel's Deficient Penalty-Phase Investigation.

A showing of "prejudice" requires a reasonable probability that, but for counsel's ineffectiveness, a single juror would have voted for life. *Wiggins*, 539 U.S. at 537. A reviewing court must "evaluate the totality of the available mitigation evidence both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. a 397–98; *Wiggins*, 539 U.S. at 536. In that "reweighing" process, the Court's focus must be on whether the "available mitigating evidence, taken as a whole, 'might well have influenced [at least one juror]'s appraisal' of [the petitioner's] moral culpability." *Wiggins*, 539 U.S. at 538 (quoting *Williams*, 529 U.S. at 398); *Rompilla*, 545 U.S. at 393.

70

An adequate investigation of Bomar's relatives would have led trial counsel to the same evidence developed on post-conviction: Bomar's upbringing was marred by his parents' excessive drinking, violent fights, and serious mental illness, as well as emotional and physical abuse. Bomar's mother was so incapable of parenting that she often abandoned her children, passing most of them off to relatives whenever she could. NT 11/7/08 at 126, 129–34, 140, 158–59; PCRA Ex. 12A (Batchelor Aff.) at 4–8; PCRA Ex. 12C at 1; PCRA Ex. 12H at 1–4, 6–7. Bomar spent most of his time in the custody of his mother, and therefore had the greatest exposure to her violent rages, hallucinations, paranoid ideations, and unpredictable behavior. By the age of seven, Bomar was already demonstrating the psychological impact of the trauma he had experienced: he would "stare off into space," had difficulty remembering things, was easily angered, engaged in regressive behavior, and was described as having a "split personality." PCRA Ex. 12A at 9–10; PCRA Ex. 12H at 4–8; NT 11/7/08 at 126, 130–34, 140, 158–59.

While at a juvenile facility, Bomar was raped and beaten until he was unrecognizable to his own mother. At the time of trial, penalty phase counsel knew of this traumatic event, noting "guard rapes [Bomar] and beat him up," in her handwritten notes from a meeting with Batchelor. However, counsel never elicited this information from Batchelor on the stand, and the jury remained ignorant of it. PCRA Ex. 12A at 8, 11; PCRA Ex. 60 (trial counsel handwritten notes); NT 10/5/98

at 105–18; NT 11/6/08 at 39–40. After his release from the juvenile facility, Bomar lived briefly with his volatile father, who was dying of cancer. When Bomar was 13 or 14 years old, he was unable or unwilling to have sex with a prostitute his father had hired for him; his father killed Bomar's pet pigeon as punishment. PCRA Ex. 11 at 8 (Dudley Aff.); PCRA Ex. 12H at 6–7.

Bomar's maternal aunt, Anna Wilson, described the difficult circumstances of her nephew's youth. *See* PCRA Ex. 12H at 2–8. Wilson reported that Bomar's mother repeatedly drank during her pregnancy with Bomar, that his mother would become "unpredictable and volatile" during such drinking, and that his mother attacked and fought with another woman at a bar. *Id.* at 2. More generally, Wilson described the violent and tumultuous circumstances under which Bomar grew up. Bomar's mother had violent fights with Bomar's father, even to the point of setting the family's apartment on fire and trying to burn her husband with kerosene. *Id.* at 4.

As developed on post-conviction, the details of Bomar's troubled background were instrumental to his eventual diagnosis of organic brain damage. Although he was unable to give such a diagnosis at the time of trial, Dr. Cooke would have found brain damage if he had been provided with reports such as Wilson's as well as medical records that he was provided years after trial. It was the "cumulative weight" of the records that allowed Dr. Cooke to diagnose organic brain damage. NT 11/6/08

72

at 201–04, 219–20, 236, 249–50. Compensating for the incomplete testing from the time of trial, Dr. Cooke was able to conclude that Bomar "did sustain organic brain damage of some sort either due to alcohol or trauma probably in utero." *Id.* at 200–02, 296–97, 308–09. Contrary to the limited information that Bomar shared with Dr. Cooke before trial, the lay witnesses described a "very violent household," Bomar's "extremely violent" mother, and a pattern of physical abuse, sexual abuse, and neglect. *Id.* at 200.

Dr. Cooke also relied on the 1979 report from Dr. Whittemore, as reflected in Nevada correctional records. *Id.* at 168–71. Dr. Whittemore found mild impairments on the Bender Gestalt test, which was "widely used" to detect brain damage at the time of his evaluation. *Id.* at 169, 171. Dr. Whittemore also observed that Bomar "has a lot of trouble sequencing" and "cannot easily distinguish between similar stimuli," which are also "important manifestation[s] of organic brain dysfunction." *Id.* at 169–70. The "cumulative" weight of all the evidence allowed Dr. Cooke to diagnose organic brain damage to a reasonable degree of psychological certainty – quite unlike at the time of trial, when Dr. Cooke was not provided this available evidence. *Id.* at 171. All told, Dr. Cooke could have presented to the jury "a picture of Mr. Bomar that showed far greater pathology" than he described at trial. PCRA Ex. 6 at 7.

Dr. Cooke was not alone in finding brain damage. Psychiatrist Dr. Richard Dudley shared that assessment, as did neuropsychologist Dr. Daniel Martell. NT 10/21/09 at 140; NT 7/28/10 at 45–48. Dr. Martell explained that Bomar's history and behavior are consistent with brain dysfunction, including evidence of gestational drinking by Bomar's mother, learning disabilities diagnosed at an early age, and Bomar's habit of "staring off into space" as a child. NT 7/28/10 at 56–58. To be sure, the Commonwealth's expert disputed the diagnosis of brain damage and found the documentary evidence insufficient. NT 2/3/10 at 113, 171–74, 182–84 (per psychiatrist Dr. Timothy Michals). But that disagreement does not diminish Bomar's showing of prejudice. Notwithstanding the contrary opinion from Dr. Michals, a reviewing court cannot "discount entirely the effect that [mental health] testimony might have had on the jury[.]" *Porter v. McCollum*, 558 U.S. 30, 43 (2009).

Organic brain damage has mitigating effect because it tends to explain Bomar's crime. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Mitigating evidence is

necessarily more compelling when it is "causally connected to the murder[]." *Thornell v. Jones*, 602 U.S. 154, 166–69 (2024).

Trial counsel desperately wanted to explain her client's offense: "I believed that we had to find something tangible that the jury could hold onto, something concrete that could tell the jury why he did what he did." NT 11/6/08 at 73. A firm diagnosis from Dr. Cooke would have provided the explanation that counsel sought. Organic brain damage – and, in particular, damage to the frontal lobes, *see* NT 7/28/10 at 123–26 – impairs one's executive function, which governs impulse control and acts as "the brakes for a person's actions." *United States v. Fields*, 949 F.3d 1240, 1252 (10th Cir. 2019); NT 7/28/10 at 126. Damage to the brakes diminishes a person's ability to stop, that is, to "adequately judge and comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions." *Fields*, 949 F.3d at 1252 (crediting such evidence).

Those are the very defects described by Drs. Cooke, Dudley, and Martell. Bomar has a "substantial impairment" in "executive frontal lobe functioning," which limits his ability to "organize, control, and direct [his] behavior," to "learn from mistakes" and to "solve problems." NT 7/28/10 at 45, 125. He has "difficulties in judgment, reasoning, [and] problem solving," as well as "poor regulation of behavior." NT 11/6/08 at 217, 284. He "fails to anticipate consequences or . . . to

look at how his behavior may impact on others." *Id.* at 150. He has impaired "impulse control" and acts with a pattern of "over-reactivity." *Id.*; NT 10/21/09 at 54; NT 7/28/10 at 126. He easily "lose[s] control" over his "aggressive and sexual impulses." NT 11/6/08 at 150. He displays "a certain sort of flatness and detachment . . . from feelings." NT 10/21/09 at 112–13.

These descriptions document an underlying pathology that the jury did not consider. They offer a counter-narrative to the Commonwealth's plea for death, which urged that Bomar "has devoted his life to inflicting pain, suffering, and misery upon fellow human beings." NT 10/5/98 at 150. The prosecutor correctly argued that the defense bore the burden of proving the mitigating circumstance that Bomar acted under an "extreme mental or emotional disturbance." *Id.* at 145–46; Pa. C.S. § 9711(e)(2). He emphasized the defense's failure of that proof, pointing out that "Just putting up a psychologist like Dr. Cook[e] doesn't carry the day." NT 10/5/98 at 145. The defense thus failed to show that Bomar's brain damage and impaired judgment act "as a common thread" tying together the offense proven at trial with the previous offenses that aggravated it. *Thomas v. Horn*, 570 F.3d 105, 129 (3d Cir. 2009). One or more jurors "may well" have believed that Bomar's impairments "lowered his culpability and thereby diminished the justification for imposing the death penalty." *Id.*

**D.    This Court Must Apply De Novo Review to Bomar's Claim, Because the State Court's Ruling Was Incomplete and Unreasonable as Explained by the District Court.**

As explained elsewhere in this application, AEDPA limits habeas corpus relief on any claim that the state courts have "adjudicated on the merits." 28 U.S.C. § 2254(d). Relief is unavailable unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). When either condition is satisfied, a federal court reviews the prisoner's claim de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Bond*, 539 F.3d at 264.

In this case, the Pennsylvania Supreme Court denied Bomar's ineffective-assistance claim on the merits. *See Bomar II*, 104 A.3d at 1197–1205. A federal court's deference under AEDPA presents a "straightforward inquiry" when, as here, "the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). In that instance, the federal court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

On the question of trial counsel's performance, two aspects of the state court's ruling militate in favor of a COA. First, the Pennsylvania Supreme Court dubiously

upheld the adequacy of counsel's investigation of Bomar's personal and family history. Relying on its own precedent in *Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002), the state court observed that "[c]ounsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel." *Bomar II*, 104 A.3d at 1203. The district court recognized this Court's holding that the state-court decision in *Bond* was itself an unreasonable application of *Strickland*. *See* A200 (citing *Bond*, 539 F.3d at 292). The district court nevertheless distinguished this case from *Bond* and *Blystone*, relying on the state court's finding that trial counsel "did not merely accept" the sanitized history offered by Bomar, and instead independently collected records and sought out family witnesses. *Id.* at 201 (quotation omitted). This conclusion is debatable among reasonable jurists for the reasons explained below. *See* Argument III.E.1, *supra*.

Second, as the district court observed, the state court simply did not address Bomar's core contention that "the mitigation investigation was deficient because counsel failed to obtain readily available mental health records and to provide those and other records in her possession to defense mental health experts." A205–06. The district court therefore reviewed that issue de novo. *Id.* at 206–11. The district court ultimately declined to resolve the issue, even while observing that counsel's performance "raises questions" and "gives the Court pause." *Id.* at 207–11. Bomar

explains below that the district court's ruling is itself debatable on the question of whether counsel performed deficiently in obtaining relevant mental health records and providing them to her experts. *See* Argument III.E.1, *supra.*

The state court's ruling was similarly questionable and incomplete on the question of prejudice. On the one hand, the Pennsylvania Supreme Court found no reasonable probability that additional mitigating evidence about Bomar's childhood and mental health would have led any jurors to find that the mitigating circumstances equaled or outweighed "the patently grave aggravating circumstances in this case." *Bomar II*, 104 A.3d at 1204; A211–12. On the other, the state court failed to consider evidence of Bomar's brain damage as diagnosed by Drs. Cooke and Dudley and confirmed by Dr. Martell. *See* A213. The district court therefore concluded that the Pennsylvania Supreme Court unreasonably applied *Strickland* and *Williams* by failing "to evaluate the totality of the available mitigating evidence." *Id.* at 213–14. Once again exercising de novo review, the district court concluded that Bomar was not prejudiced by trial counsel's failure to develop additional mitigating evidence, *id.* at 214–21, which is yet another debatable aspect of the ruling below. *See* Argument III.E.2, *supra.*

### E. This Court Should Certify Bomar's Claim Because the District Court's Rulings are Debatable Among Reasonable Jurists.

When a district court addresses the merits of a claim, a COA is justified when "reasonable jurists would find the district court's assessment of the constitutional

claim[] debatable or wrong." *Slack*, 529 U.S. at 484. The ruling below meets that description in multiple respects.

### 1.    *Strickland*'s performance prong

The district court's ruling justifies a COA even on its own terms. Reserving the question of whether trial counsel performed deficiently under prevailing professional norms, the district court all but admitted that Bomar brings a plausible constitutional claim. The district court was troubled by trial counsel's failure to discover all reasonably available mental health records, as well as her failure to share those records she did gather with Dr. Cooke and other experts. Trial counsel's performance was problematic enough that it "raises questions" and "gives the Court pause." A207–11. And for good reason: the missing records fall within counsel's responsibility "to conduct a thorough investigation of the defendant's background." *Id.* at 207–08 (quoting *Williams*, 529 U.S. at 396). Bomar's trial counsel "had no apparent strategic reason not to obtain" such records. *Id.* at 208. Some of the records went undiscovered until after trial on account of counsel's failure to provide a timely and sufficient records release – a failure that the district court found "difficult" to characterize as "reasonable." *Id.* The district court also found it "perplexing" that counsel failed to discover critical records from Bomar's incarceration in Nevada, given that counsel "was pursuing mental health records in connection with prison records." *Id.* at 209. The district court's observations themselves show that Bomar

has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Equally substantial is Bomar's showing that trial counsel did not adequately investigate family witnesses. Although the district court rejected the Pennsylvania Court's attempt to blame Bomar for not being more forthcoming about his personal history and witnesses who could describe it, the court deferred to the state court's finding that counsel "continued to investigate" despite the limited information provided by her client. A200–01. Of particular importance to Dr. Cooke's eventual diagnosis of brain damage were family accounts of the abuse, neglect, and alcohol exposure that Bomar suffered prenatally and through childhood. *Id.* at 219. That information, the district court observed, "came almost entirely from family members whom [trial] counsel had *attempted* to contact." *Id.* at 201 (emphasis added). The district court thought it adequate that counsel ordered her investigators "to contact potential mitigation witnesses, including family members." *Id.* at 168–69, 199. It upheld as "reasonable" under AEDPA the similar conclusions drawn by the Pennsylvania Supreme Court. *Id.* at 201 (citing *Bomar II*, 104 A.3d at 1202).

The district court's and state court's "attempted-to-contact" standard is objectively unreasonable because it gives short shrift to counsel's duty to seek "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524. Counsel in this case, after all, recognized that she had not gotten the "full picture" or the "whole

story" from Bomar and his family. A168, 171. Despite knowing that her own information was inadequate, counsel unreasonably departed from the "standard of care" governing mitigation investigations: "You have to spend a lot of time, make many trips to speak with the client and sometimes the family members to get them to open up." NT 11/7/08 at 124 (per mitigation specialist Kathleen Kaib). Many of Bomar's relatives were ignorant of his trial until they were approached on post-conviction. *Id.* at 144.

As but one example, the defense "tried" but failed to find Bomar's aunt Anna Wilson – who revealed on post-conviction that Bomar's mother drank alcohol and got into fights while pregnant with him. NT 11/6/08 at 107–08; PCRA Ex. 12H at 2. Wilson explained that she continues to reside at the same Reno address where she had custody of Bomar during part of his childhood. NT 11/7/08 at 152; PCRA Ex. 12H at 8. Bomar provided that address to trial counsel. NT 11/6/08 at 70–71. Although Wilson would have been willing to provide the same information that she latter offered on post-conviction, she was "never" contacted at the time of trial. PCRA Ex. 12H at 8. Trial counsel testified that her retained investigators made "an attempt" to contact Wilson. NT 11/6/08 at 108. But counsel did not dispute that Wilson did not have a working telephone at the time of trial or that Wilson had no knowledge of "someone knocking on her door." *Id.*

Because counsel knew that she lacked the "full picture" about Bomar's family, it was incumbent on counsel to make greater effort to enlist known mitigation witnesses – as the defense did on post-conviction. Trial counsel failed in the sense that "the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. By crediting as adequate an investigation that trial counsel herself knew to be incomplete, the Pennsylvania Supreme Court contradicted and unreasonably applied *Wiggins* and other controlling Supreme Court precedent. *See Bomar II*, 104 A.3d at 1202–03; *Wiggins*, 539 U.S. at 527; *Williams*, 529 U.S. at 396; *Strickland*, 466 U.S. at 690–91; 28 U.S.C. § 2254(d)(1).

## 2. *Strickland*'s prejudice prong

Reasonable jurists would also find the district court's assessment of prejudice to be "debatable or wrong." *Slack*, 529 U.S. at 484. As explained above, the district court reviewed the issue de novo, having found that the Pennsylvania Supreme Court unreasonably failed to consider "the totality of the available mitigating evidence." A213–14. Chief among that evidence was Bomar's diagnosis of organic brain damage by Dr. Cooke and others. *Id.* at 212–13. The district court determined, on its own, that Bomar was not prejudiced by counsel's incomplete mitigation investigation. A214–20.

A COA should issue because the district court's reasoning is no less problematic than the Pennsylvania Supreme Court's. For one thing, the district court

refused to include the brain-damage evidence as part of its prejudice analysis. *See id.* at 217–19. In doing so, the district court deferred to the trial-level PCRA court's factual determination that Dr. Cooke could not have diagnosed organic brain damage without *both* (a) medical documentation beyond the trial record, including the Nevada correctional records showing Dr. Whittemore's neuropsychological findings and test results from 1979, *and* (b) post-trial factual evidence that Bomar sustained a brain injury from in utero alcohol exposure or physical trauma as disclosed by his aunt. *Id.* at 218–19. It was only the "cumulative weight" of the medical records and lay affidavits that allowed Dr. Cooke to diagnose organic brain damage "to a reasonable degree of psychological or neuropsychological certainty." *Id.* at 219. Having concluded that trial counsel was not ineffective in pursuing lay witness accounts of Bomar's history, the district court reasoned that counsel's failure to obtain medical records and share them with her experts did not *by itself* prevent Dr. Cooke from finding brain damage. *Id.* at 218–19. The court therefore excluded brain damage from its prejudice calculus under *Strickland*.

As narrowed by the district court, the missing medical records had a "significantly muted" effect. *Id.* at 217. That effect was limited to Dr. Cooke's addition of "paranoid features" to his trial diagnosis of borderline personality disorder. *Id.* That evidence, in the district court's view, would have altered the jury's sentencing determination "only modestly," in light of the "patently grave"

aggravators that included the rape and murder of Aimee Willard, as well as a previous homicide in Nevada. *Id.* at 219–20.

The district court's prejudice analysis is at least debatably wrong in two respects. First, as Bomar has already explained, trial counsel was deficient *both* in her investigation of family witnesses *and* her gathering of medical records. *See* Section III.E.1, *supra*. Because counsel's efforts to locate and interview critical mitigation witnesses fell short of the prevailing standard of care, *id.*, the district court erred by excluding Bomar's brain damage when it assessed *Strickland* prejudice.

Second, the admittedly serious aggravating circumstances of this case do not by themselves preclude a showing of prejudice on the post-conviction record. *See* A219–21. Evidence of brain damage is critical because it would have accounted for Bomar's "patently grave" criminal conduct, including his poor judgment, his diminished ability to control "aggressive and sexual impulses," and his impaired capacity to weigh and consider the consequences of his actions. *See* NT 7/28/10 at 45, 123–26; NT 11/6/08 at 150, 217, 284; NT 10/21/09 at 112–13. Bomar's jury was ignorant of his brain damage, which would have served as a "common thread" tying together the offense conduct with his previous crimes. *Thomas*, 570 F.3d at 129. Evidence like that presented here can "totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior." *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988). But trial

counsel could not meaningfully mitigate the "patently grave" crimes that she lacked the evidence to explain. Bomar's showing of prejudicially ineffective assistance is "adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336; *Slack*, 529 U.S. at 484. The Court should certify his claim.

## IV.    REASONABLE JURISTS COULD DEBATE WHETHER THE MULTIPLE CONSTITUTIONAL VIOLATIONS AT BOMAR'S TRIAL CUMULATIVELY REQUIRE HABEAS RELIEF.

Reasonable jurists could also debate whether the several constitutional violations underlying Bomar's conviction and sentence cumulatively merit relief, and this Court should accordingly certify his cumulative-error claim. This Court has "recognize[d] that errors that individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007); *see also Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) ("Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process."). This principle aligns with long-standing Supreme Court precedent holding that cumulative error can give rise to a constitutional violation. *See Taylor v. Kentucky*, 436 U.S. 478, 487–88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument); *Kyles*, 514 U.S. at 437–38 (cumulative prejudice multiple items of suppressed exculpatory evidence).

The district court in this case recognized multiple trial errors, including two "potential constitutional errors" as to which "neither error was prejudicial on its own under the applicable standard." A222. First, in connection with Bomar's *Napue*/*Brady* claim, the prosecution failed to disclose its "understanding" with witness O'Donald as reflected in the "Points to Cover" memorandum. *Id.* Second, trial counsel failed "to obtain mental health records and provide them to defense mental health experts" for diagnostic purposes. *Id.* Third, the district court acknowledged that it was "improper" for a deputy to advise a juror, in response to the juror's question about the amount of security, that the court had received a threat from a criminal gang in Philadelphia. A237–38. Even if this Court were to conclude that each of these errors individually is insufficient to warrant relief, it could still conclude that the cumulative effect of the errors and the additional errors described in this Application resulted in a fundamentally unfair trial. At a minimum, this issue is debatable among jurists of reason. This Court should therefore grant COA to assess whether the cumulative effect of these errors merits habeas relief.

## CONCLUSION

Arthur Bomar has satisfied the requirements for granting a certificate of appealability by showing that his constitutional claims have substantial merit and that reasonable jurists could, at a minimum, debate the district court's rulings. Accordingly, this Court should grant COA on all of the claims presented above.

Respectfully submitted,

/s/ Katherine Ensler
Katherine Ensler
Josephy W. Luby
Carrie Allman
Assistant Federal Defenders
Federal Community Defender Office
   for the Eastern District of Pennsylvania
Curtis Building, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928–0520

Counsel for Appellant Arthur Bomar

Dated: July 24, 2025

## CERTIFICATE OF COMPLIANCE

This application contains 21,480 words, which exceeds the presumptive word limit for motions. *See* Fed. R. App. P. 27(d)(2). Counsel have concurrently filed a motion for leave to file the instant Application.  This Application also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14.

## CERTIFICATE OF SERVICE

I, Katherine Ensler, hereby certify that on July 24, 2025, I caused a copy of the foregoing motion for extension of time to be filed and served electronically through ECF on:

Catherine B. Kiefer, Esq.
Deputy District Attorney
Office of the Delaware County District Attorney
Delaware County Courthouse
201 West Front Street
Media, Pennsylvania 19063

/s/ Katherine Ensler
Katherine Ensler